**HELENA CHEMICAL COMPANY and Hyperformer Seed Company, Petitioners,**

v.

**Kenneth WILKINS and Tom Wilkins individually, and d/b/a Chapotal Farms and Porciones 99 Properties, Geen Wilkins and Mark Wilkins, individually and d/b/a Tabasco, and Wilkins Family Limited Partnership, Respondents.**

No. 00–0418.

Supreme Court of Texas.

Argued Feb. 7, 2001.

Decided April 26, 2001.

Charles C. Murray, Lisa Powell, Atlas & Hall, McAllen, for Petitioners.

John B. Skaggs, Skaggs & Garza, Michele Nicole Gonzales, McAllen, for Respondents.

Justice BAKER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice HANKINSON, Justice O'NEILL, and Justice JEFFERSON joined.

This is a case of first impression involv-

ing the Texas Seed Arbitration Act.[1] The Act requires that certain defective-seed claims be submitted to arbitration as a prerequisite to maintaining a legal action against the labeler. We must decide whether the timeliness requirement for submitting claims to arbitration is jurisdictional under the Act. We conclude that it is not, and that the evidence was legally sufficient to support the jury's verdict on liability, causation, and damages. Accordingly, we affirm the court of appeals' judgment.

## I. BACKGROUND

The Wilkinses began farming in 1989 and first planted grain in 1992. Most of their land is nonirrigated dryland. They purchased a Cherokee-variety grain sorghum seed from Helena Chemical Company in 1992, 1993, and 1994. The Wilkinses claim that when they purchased this seed, they relied on Helena's advertising that it had "excellent dryland yield potential." Helena also represented that the seed had a "good field tolerance" to charcoal rot, a condition that causes the grain's stem to weaken and "fall down," reducing yield.

The 1992 crop had a good yield, but the 1993 crop yield was much lower. The Wilkinses claim that Helena's agent blamed this low yield on the seeds being planted too close together and that the agent recommended planting Cherokee seed on the entire tract with increased spacing between seeds. The Wilkinses followed this advice in 1994 with no increase in yield. Helena claims that insufficient rainfall and soil moisture depletion brought about by the Wilkinses' planting cotton on part of the property in 1993 caused the reduced yield.

In February 1995, the Wilkinses sued Helena alleging Deceptive Trade Prac-

tices—Consumer Protection Act (DTPA) violations, breach of express and implied warranties, and fraud. In March, Helena filed a plea in abatement and motion to compel nonbinding arbitration under the Act. In April, the trial court granted Helena's motion and abated the proceedings. Fifteen months later, the Wilkinses submitted their claims to the Texas Plant and Seed Board for arbitration. The Board declined to arbitrate because the crops were no longer in "field condition" and thus the Board could not inspect the crops.

The trial court lifted the abatement and the case proceeded to trial. The jury found for the Wilkinses on all claims except fraud. It did not find that Helena had acted knowingly. It awarded the Wilkinses $360,000 in damages. The trial court also awarded prejudgment interest from the date the Board declined to arbitrate. Helena and the Wilkinses appealed.

The court of appeals held that Helena had effectively disclaimed any warranties. 18 S.W.3d at 758. But it affirmed the judgment on the DTPA claims, holding that the Board's refusal to arbitrate the Wilkinses' claims did not jurisdictionally bar their suit. 18 S.W.3d at 751–52. It also held that the evidence was legally and factually sufficient to support the jury's verdict on causation, liability, and damages. 18 S.W.3d at 754–59. Finally, in response to the Wilkinses' cross-appeal, the court held that the trial court properly calculated prejudgment interest. 18 S.W.3d at 760. Only Helena petitioned this Court for review.

## II. TEXAS SEED ARBITRATION ACT

Helena argues that the trial court did not have jurisdiction over the Wilkinses'

---

1. Unless otherwise indicated, all references to "the Act" are to the Texas Seed Arbitration Act. *See* Tex. Agric. Code § 64.001–.007.

claims because the Act requires that all defective-seed claims first be timely submitted to nonbinding arbitration so the Board may effectively inspect the plants under field conditions. Thus, Helena argues, the Wilkinses' delay in submitting their claims for arbitration—which caused the Board to refuse to arbitrate—jurisdictionally barred the claims.

In response, the Wilkinses argue that submitting their claims to arbitration is all the Act requires. They posit that Helena's interpretation would render other statutory provisions meaningless and note that the Act does not authorize dismissal as a remedy under its arbitration procedures. Thus, the Wilkinses argue, the court of appeals correctly held that once they submitted their claims to arbitration under the Act, the trial court had jurisdiction to hear the claims regardless of whether arbitration actually occurred.

## A. APPLICABLE LAW

### 1. Texas Seed Arbitration Act

The Legislature enacted the Act in 1989 to "provide[ ] for an unbiased third party investigation by the State Seed and Plant Board of the Texas Department of Agriculture of complaints concerning seed performance." HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). Pertinent to this appeal, the Act provides:

§ 64.002. **Requirement of Arbitration**

(a) When a purchaser of seed designed for planting claims to have been damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed under this subtitle or as a result of negligence, the purchaser *must submit* the claim to arbitration as provided by this chapter *as a prereq-*

*uisite* to the exercise of the purchaser's right to maintain a legal action against the labeler. . . .

TEX. AGRIC. CODE § 64.002(a) (emphasis added).

§ 64.004. **Effect of Arbitration**

In any litigation *involving a complaint that has been the subject of arbitration* under this chapter, any party may introduce the report of arbitration as evidence of the facts found in the report, and the court may give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable. The court *may also take into account any findings of the board of arbitration* with respect to the failure of any party to cooperate in the arbitration proceedings, *including any finding as to the effect of delay in filing the arbitration claim* or the arbitration board's ability to determine the facts of the case.

TEX. AGRIC. CODE § 64.004 (emphasis added).

§ 64.005. **Arbitration Board**

(b) As a board of arbitration, the State Seed and Plant Board *shall conduct arbitration* as provided by this chapter. . . .

TEX. AGRIC. CODE § 64.005(b) (emphasis added).

§ 64.006. **Arbitration Procedures**

(a) A purchaser *may begin arbitration* by filing with the commissioner a sworn complaint and a filing fee, as provided by department rule. . . . Except in the case of seed that has not been planted, *the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions.*

. . . .

(c) The commissioner shall refer the complaint and the answer to the arbitration board for investigation, findings, and recommendations.

(d) On referral of the complaint for investigation, the arbitration board shall make a prompt and full investigation of the matters complained of and report its findings and recommendations to the commissioner not later than the 60th day after the date of the referral, or before a later date determined by the parties.

(e) The report of the arbitration board shall include findings of fact, conclusions of law, and recommendations as to costs, if any. . . .

. . . .

(h) The arbitration board shall consider any field inspection or other data submitted by either party in its report and recommendation.

TEX. AGRIC. CODE § 64.006 (emphasis added).

## 2. Statutory Construction

■■■ We must construe statutes as written and, if possible, ascertain legislative intent from the statute's language. *Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex.1985). Even when a statute is not ambiguous on its face, we can consider other factors to determine the Legislature's intent, including: the object sought to be obtained; the circumstances of the statute's enactment; the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; the consequences of a particular construction; administrative construction of the statute; and the title, preamble, and emergency provision. TEX. GOV'T CODE § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 350 (Tex.2000).

■■■ Additionally, we must always consider the statute as a whole rather than its isolated provisions. *Morrison*, 699 S.W.2d at 208. We should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone. *Barr v. Bernhard*, 562 S.W.2d 844, 849 (Tex.1978). We must presume that the Legislature intends an entire statute to be effective and that a just and reasonable result is intended. TEX. GOV'T CODE § 311.021(2),(3).

■■■ When used in a statute, the term "must" creates or recognizes a condition precedent. TEX. GOV'T CODE § 311.016(3). While Texas courts have not interpreted "must" as often as "shall," both terms are generally recognized as mandatory, creating a duty or obligation. *See* TEX. GOV'T CODE § 311.016(2), (3); *Wright v. Ector County Indep. Sch. Dist.*, 867 S.W.2d 863, 868 (Tex.App.—El Paso 1993, no writ) ("The ordinary meaning of 'shall' or 'must' is of a mandatory effect."); *Inwood N. Homeowners' Ass'n, Inc. v. Meier*, 625 S.W.2d 742, 743 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ) (same); *Mitchell v. Hancock*, 196 S.W. 694, 700 (Tex.Civ. App.—Fort Worth 1917, no writ) (same). The word " 'must' is given a mandatory meaning when followed by a noncompliance penalty." *Harris County Appraisal Dist. v. Consolidated Capital Props. IV*, 795 S.W.2d 39, 41 (Tex.App.—Amarillo 1990, writ denied). However, we have held language that appears to impose a mandatory duty to be only directory when this interpretation is most consistent with the Legislature's intent. *E.g., Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 629 (Tex. 1996); *Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310 (Tex.1976);

*Thomas v. Groebl,* 147 Tex. 70, 212 S.W.2d 625, 630–31 (1948).

To determine whether the Legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction. *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999); *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943, 945 (1956). Even if a statutory requirement is mandatory, this does not mean that compliance is necessarily jurisdictional. *Sinclair,* 984 S.W.2d at 961; *Hines v. Hash,* 843 S.W.2d 464, 467 (Tex. 1992); *Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 938 (Tex.1983). When a statute is silent about the consequences of noncompliance, we look to the statute's purpose to determine the proper consequences. *Sinclair,* 984 S.W.2d at 961; *Schepps,* 652 S.W.2d at 937–38; *Chisholm,* 287 S.W.2d at 945.

### B. ANALYSIS

The parties agree that if the Wilkinses had not submitted their claims to arbitration after the trial court abated the proceedings, any claims subject to the Act would be jurisdictionally barred. *See* TEX. AGRIC. CODE § 64.002(a) ("[T]he purchaser must submit the claim to arbitration ... as a prerequisite to the exercise of the purchaser's right to maintain a legal action against the labeler."); *see also Hines,* 843 S.W.2d at 469 (holding failure to perform mandatory but nonjurisdictional act while suit is abated for that purpose results in dismissal). However, because the Wilkinses did submit their claims to the Board, the only issue is whether their delay in doing so, and the Board's subsequent refusal to arbitrate, deprived the trial court of jurisdiction.

Helena argues that section 64.006(a)'s requirement that a complaint be "filed within the time necessary to permit effective inspection of the plants under field conditions" is mandatory and jurisdictional. The Wilkinses acknowledge this statutory timing requirement, but argue that submission is the mandatory act and that timeliness is merely a factor the trial court may consider. We agree with the Wilkinses' interpretation.

Section 64.006(a) states that a purchaser's complaint "must" be filed within the time necessary to permit effective inspection under field conditions. The word " '[m]ust' creates or recognizes a condition precedent." TEX. GOV'T CODE § 311.016(3). The Legislature has instructed us to apply this definition unless its context "necessarily requires a different construction." TEX. GOV'T CODE § 311.016.

The problem with Helena's position that delay in submitting a claim to arbitration creates a jurisdictional bar is that we cannot read section 64.006(a) in a vacuum. Read in context, Helena's interpretation renders other provisions meaningless. In fact, section 64.004 expressly contemplates that a claim may be arbitrated and continue on to trial even when a delay in submission to arbitration prevents the Board from thoroughly investigating the claim. It provides:

> In any litigation involving a *complaint that has been the subject of arbitration under this chapter* ... [t]he court may also take into account any findings of the board of arbitration with respect to the failure of any party to cooperate ... *including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.*

TEX. AGRIC. CODE § 64.004 (emphasis added). Accepting Helena's argument that section 64.006(a)'s timing requirement is

jurisdictional renders section 64.004 meaningless because in any case "involving a complaint that has been the subject of arbitration under this chapter," there could not be a "finding as to the effect of delay in filing ... or the arbitration board's ability to determine the facts of the case."

■ Actually, the Act's language and purpose demonstrate that the Legislature simply did not contemplate the situation presented here—a submission to arbitration where the Board then refuses to arbitrate. Rather, the Legislature created this arbitration scheme to provide an alternate forum for farmers to initially submit claims, not as a mechanism to preclude farmers' suits altogether. *See* House Comm. on Agriculture and Livestock, Bill Analysis, Tex. S.B. 64, 71st Leg., R.S. (1989) (explaining that one reason this Act was passed was that "farmers are often reluctant to litigate" seed disputes).

In addition to the overall statutory objective, we have historically looked to two factors to determine if the Legislature intended a provision to be jurisdictional: (1) the presence or absence of specific consequences for noncompliance, *Sinclair*, 984 S.W.2d at 961–62, and (2) the consequences that result from each possible interpretation. *Barshop*, 925 S.W.2d at 629. Applying these factors supports our interpretation that delay in submitting claims is not jurisdictional.

■ To determine whether a timing provision is mandatory, we first look to whether the statute contains a noncompliance penalty. If a provision requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory. *Lewis*, 540 S.W.2d at 310; *Markowsky v. Newman*, 134 Tex. 440, 136 S.W.2d 808, 812 (1940). Here, the Act states that a purchaser's

complaint must be filed "within the time necessary to permit effective inspection of the plants under field conditions." Tex. Agric. Code § 64.006(a). However, the Act has no corresponding provision dictating dismissal for noncompliance. *State v. $435,000*, 842 S.W.2d 642, 644 (Tex.1992) ("If the Legislature had intended dismissal to be the consequence of a failure to hear a forfeiture case within the prescribed period, it could easily have said so."); *see also Sinclair*, 984 S.W.2d at 962 ("[T]hat section 410.253 does not dictate the consequence of noncompliance is significant when considering the entire statute."). To the contrary, the Act expressly provides nonjurisdictional consequences by allowing the Board to make findings about any delay and allowing the trial court to consider these findings. *See* Tex. Agric. Code § 64.004. Thus, we conclude the Act's silence about dismissal, coupled with its provision for other consequences, weighs in favor of a nonjurisdictional interpretation.

When deciding whether the Legislature intended a particular provision to be jurisdictional, we must also consider the consequences that result from each possible construction. *Chisholm*, 287 S.W.2d at 945–46. Under Helena's interpretation, a delay in submitting a claim to arbitration precludes any consideration of the claim— by the Board or a trial court. Because the Board's arbitration is nonbinding and the trial court is not required to consider the Board's findings, we conclude that Helena's jurisdictional interpretation of section 64.006's timing requirement leads to an absurd result. *See Barshop*, 925 S.W.2d at 629.

Helena urges that our adopting a nonjurisdictional interpretation allows purchasers to bypass the Act and thwart its underlying purpose of providing for an unbiased, independent Board investigation. *See* House Comm. on Agriculture

AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). We disagree.

The Act permits the Board to independently investigate and assess the purchaser's claims. TEX. AGRIC. CODE § 64.006(d). But, while the Act *requires* the Board to consider any field inspection or other data either party submits, nowhere does it require the Board itself to conduct a field inspection; nor does it expressly mention the Board conducting such an inspection. *See* TEX. AGRIC. CODE § 64.006(f)-(h). Instead, by the Act's express terms, the Board can carry out its investigation in a number of ways that do not necessarily require it to conduct its own field inspection. For example, the Act authorizes the Board to delegate all or any part of its investigation to its members. TEX. AGRIC. CODE § 64.006(g). And the Board may grow representative samples, conduct hearings, and examine the parties. TEX. AGRIC. CODE § 64.006(f). In fact, here both parties' experts conducted field inspections that they could have submitted to the Board to aid it in fulfilling its duties. *See* TEX. AGRIC. CODE § 64.006(h) ("The arbitration board *shall* consider any field inspection or other data submitted by either party.") (emphasis added). Thus, because the Board can conduct an investigation despite a delay in submission to arbitration, concluding that section 64.006(a)'s timing requirement is nonjurisdictional does not thwart the Act's purpose of providing for a Board investigation. *See Hines*, 843 S.W.2d at 469 (holding statute's purpose could be furthered without jurisdictional interpretation of mandatory timing requirement).

Further, our interpretation does not render a delay in submitting a claim to arbitration without consequence. Indeed, if a purchaser does not submit a claim in time for the Board or the seller to conduct an effective field inspection, it does so at its own peril. The Board may make findings adverse to the purchaser on this basis. TEX. AGRIC. CODE § 64.004. If the purchaser then sues, the Board's findings and recommendations are admissible, and the Act expressly authorizes the court to both "give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable" and "take into account any findings ... with respect to the failure of any party to cooperate in the arbitration proceedings, including any finding as to the effect of delay in filing the arbitration claim." TEX. AGRIC. CODE § 64.004. We conclude that these consequences—not the complete deprival of any right to have the claims heard in any forum—are the consequences the Legislature contemplated under the Act.

The dissent disagrees with this conclusion, asserting that the Act absolutely forecloses a purchaser's action if the purchaser does not comply with section 64.006(a)'s timing requirement. 47 S.W.3d at 507. The dissent notes section 64.006's language that the complaint "must" be filed within the time necessary to permit effective crop inspection. 47 S.W.3d at 507. It then reconciles this language with section 64.004 by interpreting section 64.004 to permit Board findings about a purchaser's delay only while the crops are still in the ground. 47 S.W.3d at 507. It explains that "[a] purchaser could certainly delay filing an arbitration complaint for many months yet still file while the seeds are under field conditions." 47 S.W.3d at 508. Thus, it reasons, submitting a claim while the seeds are in the ground, but after a hot summer season, could "affect the Board's investigation." 47 S.W.3d at 511.

However, while purporting to apply a plain-language analysis to section

64.006(a), the dissent glosses over the section's actual language and ignores the maxim that we must presume that every word in a statute is included purposefully. *See Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981). First, the dissent's interpretation assumes the Board itself must conduct the field inspection referenced in section 64.006(a). The Act's text does not support this assumption. Instead, the Act provides that a complaint must be filed in time to "permit effective inspection of the plants under field conditions," TEX. AGRIC. CODE § 64.006(a), thus permitting the parties to inspect under field conditions and provide their reports to the Board. TEX. AGRIC. CODE § 64.006(h). Second, the dissent's interpretation presumes that any claim submitted while crops are still in the ground will satisfy section 64.006(a)'s language. 47 S.W.3d at 511. However, section 64.006 does not only require that a claim be submitted while the crops are available for inspection "under field conditions." Rather, it states a claim must be filed in time to permit an *"effective* inspection of the plants under field conditions." TEX. AGRIC. CODE § 64.006(a) (emphasis added). We must presume the word "effective" has meaning. *See Cameron,* 618 S.W.2d at 540. Thus, under the dissent's interpretation of 64.006(a), any claim brought while the crops are in the ground *but after* an *effective* inspection could be accomplished would *already be barred* under 64.006(a)— rendering section 64.004's provision for the Board to make findings about delay in submitting the claim meaningless.

The dissent also urges us to adopt the Florida Supreme Court's interpretation of a prior version of its Seed Act because our statute's legislative history indicates that our statute was modeled in part after Florida's. *See Ferry–Morse Seed Co. v. Hitchcock,* 426 So.2d 958, 961 (Fla.1983) (holding Florida Seed Act's arbitration submission

timing requirement jurisdictional). There is only one reference to Florida in our Act's bill analysis. The background section notes that "[f]or many years the state of Florida has used a method of arbitration with an unbiased third party investigation and opinion" and that "[t]he American Seed Trade Association has recommended to each of its member states that they work to pass measures similar to Florida's." HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989).

 We recognize that when a Texas statute is modeled after another jurisdiction's, that jurisdiction's interpretation before the Legislature enacts our statute may be given weight. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 360 (Tex.2000). However, when the Legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully. *See Sharifi v. Young Bros., Inc.,* 835 S.W.2d 221, 223 (Tex.App.—Waco 1992, writ denied).

When the Legislature enacted the Texas Act, the Florida Seed Act provided that a purchaser must submit its claim to arbitration "within such time as to permit inspection of the crops, plants, or trees by the seed investigation and conciliation council or its representatives *and* by the dealer from whom the deed was purchased." FLA. STAT. ANN. § 578.026(1)(a) (emphasis added). In *Ferry–Morse Seed Co.,* the case upon which the dissent relies, the Florida Supreme Court interpreted a prior version's timing requirement to be jurisdictional. 426 So.2d at 961. This prior version required a claim be filed "within ten days after the defect or violation becomes apparent." *See Ferry–Morse Seed Co.,* 426 So.2d at 960. There are two important differences between the Texas

and Florida Acts. First, the Florida Act's current version specifies that the Board and the seed seller must *both* be able to conduct an independent field inspection. The Texas Act has no such language. Second, and more significant, neither version of Florida's Act provides for the Board to make findings about the effect of the purchaser's delay in submitting a claim to arbitration as section 64.004 of the Texas Act does. Thus, while we might be inclined to adopt Florida's interpretation that timely submitting to arbitration is jurisdictional if its statute were identical to ours, we are not bound to interpret one similar provision of our Act in a way that conflicts with other provisions that differ from Florida's statute.

Finally, while we base our interpretation on the Act's language and the Legislature's intent, we note that one other court has had occasion to interpret its Seed Act's similar arbitration provisions. Illinois' Seed Act provides:

> A purchaser of seed *cannot maintain a civil action against the seller* for failure of the seed to produce or perform (i) as represented by a label attached to the seed or furnished under the Illinois Seed Law, (ii) as represented by warranty, or (iii) because of negligence, *unless the buyer has first submitted the claim to arbitration.*
>
> . . . .
>
> Except in case of seed that has not been planted, *the claim shall be filed within a time that will permit effective inspection of the plants under field conditions* and in no case later than 90 days after completion of harvest.

701 ILL. COMP. STAT. 25/10, 25/20 (emphasis added). In *Presley v. P & S Grain Co.,* the Illinois court of appeals held this timing requirement to be directory rather than mandatory. 289 Ill.App.3d 453, 225 Ill.Dec. 398, 683 N.E.2d 901, 910 (1997).

It reasoned, as we have here, that the statute's failure to provide for dismissal as a consequence for noncompliance with its arbitration provisions weighs in favor of a directory interpretation. *Presley,* 225 Ill. Dec. 398, 683 N.E.2d at 909. Likewise, it concluded that interpreting the nonbinding arbitration procedures as jurisdictional would lead to an absurd result. *Presley,* 225 Ill.Dec. 398, 683 N.E.2d at 909.

We agree with the Florida Supreme Court's observation that seed arbitration laws are "established to protect the farmer." *Ferry–Morse Seed Co.,* 426 So.2d at 961. Thus, when, as here, we are faced with two competing interpretations, we must choose the one most harmonious with the Act's objectives and other provisions. Accordingly, we conclude that while submission to arbitration under the Act is mandatory if not waived by the seller, the Act's timing requirement is not. *See Hines,* 843 S.W.2d at 469; *$435,000,* 842 S.W.2d at 644. Because the Wilkinses submitted their claims to arbitration and thus complied with the Act's mandatory requirements, the trial court correctly concluded that it had jurisdiction over their claims.

## III. EXPERT TESTIMONY

Helena argues that the trial court abused its discretion by admitting the Wilkinses' expert's testimony. The expert, Dr. Pleunneke, testified that in his opinion, Cherokee seed is not appropriate for dryland farming and thus did not perform as represented. Helena contends that Pleunneke lacked the required qualifications and that his testimony lacked the "indicia of reliability" required for admission. The court of appeals held the trial court did not abuse its discretion by admitting Pleunneke's testimony. 18 S.W.3d at 754. We agree with the court of appeals.

## A. APPLICABLE LAW

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise. TEX.R. EVID. 702. Otherwise admissible opinion testimony is not objectionable because it embraces an ultimate issue of fact. TEX.R. EVID. 704.

■■■ A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Robinson,* 923 S.W.2d at 556. The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Robinson,* 923 S.W.2d at 558.

■■■ In deciding if an expert is qualified, trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998) (quoting *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996)). To gauge reliability, we have explained:

> *Daubert* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.

*Gammill,* 972 S.W.2d at 725–26 (quotations omitted). In *Robinson,* we identified six nonexclusive factors to determine whether an expert's testimony is reliable and thus admissible. *Robinson,* 923 S.W.2d at 557. But in *Gammill* we recognized that the *Robinson* factors may not apply to certain testimony. *Gammill,* 972 S.W.2d at 726. In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. *Gammill,* 972 S.W.2d at 726. If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). Further, an expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. *Havner,* 953 S.W.2d at 714.

## B. ANALYSIS

### 1. Qualifications

■■■ Pleunneke testified that he grew up on a ranch. He earned a bachelor's degree in wildlife management from Texas A & M University. He then worked in a bank's trust department managing farm and ranch lands in Texas and Louisiana. During this time he worked with many different types of crops, including grain sorghum. He then returned to school and finished a doctorate in plant physiology. Afterwards, he worked with crops for Mississippi State University's Agronomy and Biochemistry Department. At this job, he conducted crop-variety testing, predominantly on soybean crops, and he was "quite familiar with setting up tests and so forth and see[ing] which varieties are best." For the past twenty years he has worked in Texas as a plant scientist and consultant. He characterized some of his func-

tions as "work[ing] on different problems related to plant science, science pertaining to the physiology of plants, malnutrition, the way the environment affects them and so forth." In fact, the Wilkinses initially hired him, not as a litigation expert, but as a consultant to help them identify the source of their crop problems.

Helena notes that Pleunneke is not a plant pathologist and argues that his testimony does not establish he is an expert about charcoal rot. However, this argument incorrectly frames the issue. The Wilkinses allege Helena misrepresented Cherokee seed's fitness for use in a nonirrigated environment. Accordingly, the factual issue is not solely whether Cherokee is susceptible to charcoal rot. Also at issue is whether Cherokee is particularly suited for dryland farming as Helena represented.

The causation evidence in this case included: seed performance trial results, the Wilkinses' farm's current and past performance, the current and past performance of the Wilkinses' neighbor's farm, and weather and soil statistics. In response to this evidence, Helena contended that environmental factors, not Cherokee seed's drought intolerance, led to the Wilkinses' poor crop. Thus, to determine whether Pleunneke is a qualified expert, the question is whether Pleunneke has scientific, technical, or other specialized knowledge that would assist the jury to understand this evidence and determine if Cherokee seed is suitable for dryland farming as represented. *See* Tex.R. Evid. 702.

We conclude that Pleunneke's knowledge would aid the jury in understanding the evidence. Several grain performance trial results were entered into evidence. Pleunneke has experience conducting crop trials, and, presumably, experience interpreting and comparing those results. Also, as a plant-science consultant, he

works on "different problems related to plant science, science pertaining to the physiology of plants, malnutrition, the way the environment affects them and so forth." Because Helena contends environmental factors caused the Wilkinses' crop failure rather than Cherokee seed's drought intolerance, Pleunneke's experience identifying environmental factors affecting crops could have been helpful to the jury. Accordingly, we conclude that the court of appeals correctly held that the trial court's finding Pleunneke qualified was not an abuse of discretion.

## 2. Reliability

■ Helena also contends that Pleunneke's testimony is unreliable because he is not qualified to testify about charcoal rot and because he does not state the basis and the methodology behind his opinion. Again, Helena fails to recognize that the issue here is whether Cherokee seed is suitable for dryland farming as Helena represented. And it ignores the numerous bases underlying Pleunneke's opinion and his qualifications.

Pleunneke testified that, in forming his opinions, he relied on a number of things: a physical inspection of the Wilkinses' Cherokee crop; photographs and videotape of the Wilkinses' field; samples of the Wilkinses' soil and plants; samples of the Wilkinses' neighbors' soil and plants; lab analysis results from his field samples; South Texas rainfall statistics during the relevant period; Texas A & M grain-sorghum trials; Texas A & M grain-sorghum literature; publications by Dr. Fredrickson, a Texas A & M plant pathologist who is a grain-sorghum expert; Helena's soil and plant samples and analyses; and Helena's marketing literature. Helena does not argue that this foundational data underlying Pleunneke's opinion testimony is unreliable.

Moreover, Pleunneke has twenty years experience as a plant scientist and conducting and interpreting crop trials. While testifying, Pleunneke explained the results of several grain trials, why he found those to be significant, and how they supported his opinions. He also explained the other factors that contributed to his opinion, and why they were significant to his conclusions. These other factors included weather and weed-control reports, disease publications, testing, and comparison with crops adjacent to the Wilkinses' farm. Thus, Pleunneke's experience, coupled with his thorough testimony about the methodology he employed, demonstrate that the opinions he drew from the underlying data are reliable. *See Gammill*, 972 S.W.2d at 726. Thus, we conclude that the court of appeals correctly held that the trial court did not abuse its discretion by admitting Pleunneke's testimony.

## IV. DTPA CLAIMS

Helena argues that the Wilkinses' failure to timely submit their claims to arbitration under the Act also precludes the trial court from considering their DTPA claims. In the alternative, it argues that there is no evidence to support the jury's DTPA liability and causation findings. Specifically, Helena argues that any representations it made amounted to nonactionable puffing.

### A. RELATIONSHIP BETWEEN THE DTPA AND THE TEXAS SEED ARBITRATION ACT

Helena argues that if the Act governs any part of a suit, then all the purchaser's claims must be arbitrated, regardless of the theory of recovery. The dissent agrees, concluding that all the Wilkinses' theories are "factually intertwined," and thus that their DTPA claims cannot provide an alternative basis for the trial court's judgment. Because we conclude

that the Wilkinses complied with the Act and hold that their delay in submitting their claims to arbitration did not bar their suit, determining whether the DTPA claims are within the Act's purview is not necessary here.

### B. EVIDENCE TO SUPPORT DTPA JURY QUESTIONS

The trial court submitted two DTPA questions to the jury. The first question asked, in the disjunctive, whether Helena had violated three DTPA laundry-list provisions: sections 17.46(b)(5) (misrepresentations about a product's characteristics), 17.46(b)(7) (misrepresentations about a product's standard, quality, or grade), or 17.46(b)(23) (failure to disclose information with intent to induce another to enter transaction). *See* TEX. BUS. & COM.CODE § 17.46. The second question asked only whether Helena violated section 17.50(a)(3) (unconscionable action or course of action). *See* TEX. BUS. & COM.CODE § 17.50. The jury answered both questions "yes."

Helena argues that there is no evidence to support the jury's answers. Specifically, it argues that any representations made to the Wilkinses amounted to nonactionable puffing and that there is no causation evidence. The court of appeals held there was some evidence to support the jury's answers to both questions. 18 S.W.3d at 755–57. We agree with the court of appeals.

### 1. Applicable Law

The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM.CODE § 17.46(a). Section 17.46(b) is a laundry list of specifically prohibited acts. Sections 17.46(b)(5) and 17.46(b)(7) prohibit "false, misleading, or deceptive acts or practices includ[ing] ... representing that goods and services have

... characteristics, ingredients, uses, [or] benefits ... which they do not have" and "representing that goods or services are of a particular standard, quality, or grade ... if they are of another." Section 17.46(b)(23) prohibits "the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Section 17.50 provides the remedy for violations of the laundry-list provisions of 17.46(b) and for "any unconscionable action or course of action by any person." Actionable representations may be oral or written. *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 838 (Tex.App.—Amarillo 1993, writ denied). A party need not prove intent to make a misrepresentation under sections 17.46(b)(5) or 17.46(b)(7)—making the false representation is itself actionable. *Smith v. Baldwin*, 611 S.W.2d 611, 616–17 (Tex.1980).

To recover under the DTPA, the plaintiff must also show that the defendant's actions were the "producing cause" of actual damages. *See* TEX. BUS. & COM. CODE § 17.50(a). This showing requires some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995). Under this standard, it is not necessary to show that the harm was foreseeable. *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 481.

The DTPA does not mention "puffing" as a defense. However, this Court has recognized that "mere puffing" statements are not actionable under sections 17.46(b)(5) or 17.46(b)(7). *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex.1980). Neither this Court nor any court of appeals has extended the puffing defense to violations of sections 17.46(b)(23) (failure to disclose) or 17.50(a)(3) (unconscionable conduct).

In conducting a no-evidence review, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). If more than a scintilla of evidence exists, the evidence is legally sufficient to support the finding. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993).

### 2. Analysis

The Wilkinses offered the following evidence to support their DTPA claims:

(1) Kenny Wilkins' testimony that he read Helena's seed brochure (PX–25) before purchasing Cherokee seed and that he would not have planted Cherokee in 1993 and 1994 had the brochure not represented Cherokee was a good dryland variety.

(2) The PX–25 brochure's description of Cherokee seed as "one of the most durable, top yielding hybrids" with an "outstanding disease tolerance package."

(3) The PX–25 brochure's "grain sorghum lineup" chart stating that Cherokee seed has "good" head exertion, "very good" standability, "excellent" yield potential in drylands, and that it is "FD [field] tolerant" to charcoal rot.

(4) Helena's written representation that its sorghum hybrids "constitute our best research and development efforts," that Cherokee seed has "excellent weatherability," that Cherokee seed is "the tough performer," and that it has "the stamina and

hardiness to withstand the harsh conditions from the Texas coastal bend across the lower south to the Carolinas."

(5) Testimony that the Wilkinses did not expect a "FD tolerant" plant would be affected by charcoal rot and that they understood "tolerant" to mean that "if there was an acceptable level of something out in the field it would be tolerant to it."

(6) The American Seed Association's (of which Helena is a member) definition of "tolerant" as "the ability of plants to endure a specified pest or an adverse environmental condition, performing and producing in spite of the disorder."

(7) A Helena agent's testimony that "tolerance to charcoal rot is known to occur in grain sorghum. In this case the plant may develop a disease but may escape the full development of symptoms and produce some level of harvestable yield which it could not otherwise do in the absence of the tolerance phenomenon."

(8) The Wilkinses' testimony that they relied upon the Helena agent's oral representations.

(9) Testimony indicating that it is reasonable and customary for farmers to rely on oral representations and advice from seed companies' representatives and that, in fact, the neighboring farm's owner also relies on advice from his seed company representative.

(10) Another Helena agent's representations that Cherokee seed was a "good dry land variety and that it would hold up well under the dry land conditions," and his recommendation that the Wilkinses plant Cherokee seed.

(11) A Helena representative's statement that the Wilkinses had planted "too thick" and that if they would plant Cherokee on the whole lot, but with greater spacing, "the plant[s] will go ahead and perform."

Helena argues that its "alleged misleading statements are not statements of 'fact,' but constitute, if anything, nonactionable opinion or puffing." It relies extensively on *Autohaus, Inc. v. Aguilar*, where the court of appeals held that an automobile salesman's stating that Mercedes is the best-engineered automobile in the world and "jok[ing]" that the car would "probably" only need to be brought in for oil changes every 7,500 miles was nonactionable puffing. 794 S.W.2d 459, 464 (Tex. App.—Dallas 1990), *writ denied per curiam*, 800 S.W.2d 853 (Tex.1991). The court noted that these two sentences were "the extent of the evidence presented to show the misrepresentation by the salesman." *Aguilar*, 794 S.W.2d at 464. It also noted that the terms "probably" and "joked" demonstrated the generality of the statements. *Aguilar*, 794 S.W.2d at 464.

■ Here, the Wilkinses' evidence reflects specific representations about Cherokee seed's characteristics and specific representations about how the Wilkinses' crop in particular would perform. We conclude some of the representations in this case are much more specific than those in *Aguilar* and are more analogous to representations held actionable in other cases. *See, e.g., Pennington*, 606 S.W.2d at 687 (holding representations that used boat and motor were in "excellent condition," "perfect condition," and "just like new" were actionable misrepresentations about characteristics and benefits); *Hedley Feedlot, Inc.*, 855 S.W.2d at 831, 838–39 (holding cattle seller's representations to a buyer about "the type of cattle, weight, projected cost of feeding, the length of

time on feed, and the projected gain of the cattle" were actionable under the DTPA); *Gold Kist, Inc. v. Massey,* 609 S.W.2d 645, 646–47 (Tex.App.—Fort Worth 1980, no writ) (holding representations about seed-germination rate were actionable under the DTPA). Thus, viewing the evidence in a light most favorable to the jury's findings, we conclude that there is some evidence of misrepresentations about Cherokee seed's characteristics, quality, and grade amounting to more than mere puffing.

■■■ Helena also argues that there is no evidence that its actions were the producing cause of the Wilkinses' injuries because the Wilkinses did not exclude other possible causes for the crop failure. Specifically, Helena contends that the Wilkinses depleted their soil by planting cotton the prior year.

The Wilkinses presented evidence about Cherokee's unsuitability for dryland farming. This evidence included their crop's performance, their neighbor's crop performance, several seed performance trial results, and South Texas rainfall statistics. The Wilkinses' expert, Dr. Pleunneke, testified that Cherokee seed does not produce a good yield in a nonirrigated environment.

The Wilkinses also presented evidence excluding other causes. The court of appeals summarized this evidence:

> Wilkins explained that the cotton-grain rotation is required by the local crop-management office; his neighbor rotated cotton and grain on certain portions of his acreage without adverse effects; and the alleged "over planting" occurred because the Wilkins[es] followed the recommendations of Helena in planting their 1993 crop.

18 S.W.3d at 756. Thus, we conclude the Wilkinses presented some evidence of producing cause.

In sum, there is some evidence to support a finding that Helena violated sections 17.46(b)(5) and 17.46(b)(7). This finding is sufficient to support the jury's verdict. Thus, the court of appeals correctly held that there is some evidence of DTPA violations and that Helena's puffing defense did not defeat liability under the DTPA.

## V. DAMAGES

Finally, Helena argues that there is no evidence to support the jury's $360,000 damages award. The court of appeals held there was evidence to support this amount. 18 S.W.3d at 759. We agree with the court of appeals.

### A. APPLICABLE LAW

■■■ Recovery for lost profits does not require that the loss be susceptible to exact calculation. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). However, the injured party must do more than show that it suffered some lost profits. *Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279. The loss amount must be shown by competent evidence with reasonable certainty. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). This is a fact-intensive determination. *Heine,* 835 S.W.2d at 84. At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained. *Szczepanik,* 883 S.W.2d at 649; *Heine,* 835 S.W.2d at 84.

■■■ Texas' general rule for assessing damages for crop loss is the market value of the lost part of the crop, as measured at maturity, less the cost of harvesting and marketing the lost part. *International Harvester Co. v. Kesey,* 507 S.W.2d 195, 197 (Tex.1974). The law does not demand perfect proof of damages for crop

loss but liberally permits estimates of crop value and probable yield, as well as cultivating and marketing expenses. *International Harvester Co.*, 507 S.W.2d at 197.

## B. ANALYSIS

■ Helena argues that the Wilkinses' damages should have been limited to the Cherokee seed's purchase price. Helena relies upon the "limitation of liability and remedies" clause printed on its invoices, delivery tickets, and seed label. The DTPA provides that "[a]ny waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void." TEX. BUS. & COM.CODE § 17.42(a). We have held that a clause limiting recovery for breach of warranty is effective, even when brought under the DTPA, because the DTPA did not create warranty claims. *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576–77 (Tex.1991). However, the same does not hold true for other DTPA claims. *FDP Corp.*, 811 S.W.2d at 576–77. Thus, Helena's liability-limitation clauses cannot preclude the Wilkinses' lost-profit recovery for nonwarranty representations or unconscionability.

■ Alternatively, Helena argues that there is no evidence to support the jury's damage award because prior losses cannot establish lost profits and because the Wilkinses did not prove their damages with reasonable certainty. Specifically, Helena argues that deducting government subsides and disaster relief from the Wilkinses' income results in a history of losses rather than profits.

The Wilkinses first planted grain in 1992 and brought this suit to recover for crop damages sustained in 1993 and 1994. Thus, they only had one year to establish a profit history.

■ We have held that past profits, coupled with other facts and circumstances, *may* establish a lost-profits amount with reasonable certainty. *See Teletron Energy Mgmt., Inc.*, 877 S.W.2d at 279. However, lack of a profit history does not, by itself, preclude a new business from recovering lost future profits. *See, e.g., Orchid Software, Inc. v. Prentice–Hall, Inc.*, 804 S.W.2d 208, 211 (Tex. App.—Austin 1991, writ denied). Rather, our focus is on whether damages can be shown with reasonable certainty. *E.g., Szczepanik*, 883 S.W.2d at 649. This can be accomplished with a profit history *or* some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty. *See, e.g., Szczepanik*, 883 S.W.2d at 649; *Allied Bank W. Loop v. C.B.D. & Assocs., Inc.*, 728 S.W.2d 49, 54–55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

To establish their lost profits with reasonable certainty, the Wilkinses had to show: (1) the lost crop's market value, and (2) the harvesting and marketing expenses they would have incurred on that lost part. *International Harvester Co.*, 507 S.W.2d at 197. To calculate their lost crop's market value, the Wilkinses relied upon the United States Agriculture Stabilization and Conservation Service's farm-yield data. Each year the USASC measurement service gathers crop yield information from sorghum growers. The Wilkinses took the average sorghum yield per acre and subtracted their actual per acre yield, as evidenced by sales receipts. Then they multiplied this resulting deficit by the number of acres planted and multiplied this figure by the market price. The result was $129,170.95 for 1993 and $361,684.63 for 1994. They submitted the $490,855.58 total to the jury as their estimated damages.

To reach an estimated lost-profits figure, the cost of harvesting and marketing the lost crop must be deducted from the $490,855.58 value of the lost crop. These costs include additional lease payments, grain-elevator costs, and transportation charges. *See International Harvester Co.,* 507 S.W.2d at 197. Harvesting and marketing expenses can be liberally estimated. *International Harvester Co.,* 507 S.W.2d at 197.

Here, the Wilkinses' neighbor testified about average transportation costs to move grain between his farm and the grain elevator in McCook, Texas, where both the neighbor and the Wilkinses sent their crops. Kenneth Wilkins testified about how the grain-elevator company calculates drying charges and provided the jury with the Wilkinses' 1993 and 1994 grain-elevator receipts. The Wilkinses' leases containing the percentage of profits that the Wilkinses' were required to pay their landlord were entered into evidence. Finally, there was some evidence presented to the jury about the seed's actual price and some evidence that Helena may have "written off" a part of the price. With this evidence, the jury assessed the Wilkinses' net lost profits at $360,000. We agree with the court of appeals that the jury's damages award was within the range of evidence the Wilkinses presented and that this award is supported with evidence establishing damages with reasonable certainty. 18 S.W.3d at 759. Thus, we hold that there is some evidence to support the jury's damage award.

## VI. CONCLUSION

We conclude that the Wilkinses' delay in submitting their claims to arbitration did *not jurisdictionally bar their suit.* We also conclude that the trial court did not abuse its discretion in admitting the Wilkinses' expert's testimony. Finally, we conclude

that there is some evidence to support the jury's liability, causation, and damages findings. Accordingly, we affirm the court of appeals' judgment.

Justice ABBOTT, joined by Justice HECHT and Justice OWEN, dissenting.

Although he knew about both the alleged problem with the seed and the Act's requirement that seed complaints be submitted to arbitration, Wilkins delayed submitting his complaint to arbitration until years after he first discovered the problem. Because of this delay, it was too late for the State Seed and Plant Board to conduct a meaningful investigation, and the Board appropriately concluded that the complaint did not qualify for arbitration. Despite the Act's plain requirement that seed complaints be timely submitted to arbitration as a prerequisite to maintaining a legal action, the Court sidesteps this requirement and permits Wilkins to maintain his suit. In doing so, the Court encourages all seed buyers who wish to circumvent the Act's arbitration requirement to simply delay submitting the complaint to arbitration until it is too late for the Board to investigate. Because the Court ignores the Act's plain language and undermines the Act's purpose by permitting seed purchasers to completely circumvent the Act's arbitration requirement, I dissent.

## I

The Act's purpose is to "provide[ ] for an unbiased third party investigation by the State Seed and Plant Board of the Texas Department of Agriculture of complaints concerning seed performance." HOUSE COMM. ON AGRIC. AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). To achieve this purpose, the Act requires that a seed purchaser who "claims to have been damaged by the failure of the

seed to produce or perform as represented by warranty or by the label required to be attached to the seed ... or as a result of negligence ... must submit the claim to arbitration" before the Board *"as a prerequisite to the exercise of the purchaser's right to maintain a legal action."* TEX. AGRIC. CODE § 64.002 (emphasis added).

In order for the Board to be able to conduct a meaningful investigation, the Act expressly provides that the arbitration complaint must be submitted "within the time necessary to permit effective inspection of the plants under field conditions." *Id.* § 64.006(a). The question the Court must answer today is: When the seed purchaser does not file the arbitration complaint within the time necessary to permit effective inspection of the plants under field conditions (even though he is aware of the problem during that time and conducts his own inspection), and the Board concludes that the complaint does not qualify for arbitration because of the delay, is the purchaser's legal action based on the seller's alleged misrepresentations barred? Simple rules of statutory construction require that this question be answered yes.

First, the Act provides both that the seed purchaser *"must* submit the claim to arbitration as provided by [Chapter 64]" and that "the complaint *must* be filed within the time necessary to permit effective inspection of the plants under field conditions." *Id.* §§ 64.002, 64.006(a) (emphasis added). According to the Code Construction Act, "must" creates or recognizes a condition precedent. TEX. GOV'T CODE § 311.016(3). A condition precedent is "an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992). Thus, before a seed purchaser may maintain his suit, he must submit his claim to arbitration *and*

he must do so within the time necessary to permit effective inspection of the plants under field conditions—it is not enough to "submit" the claim when no inspection is possible. Because the Board "shall conduct arbitration as provided by [Chapter 64]," *id.* § 64.005(b), if the seed purchaser fails to timely submit the claim as directed by Chapter 64, the Board cannot arbitrate and the sole purpose of the Act is thwarted.

Second, the Legislature expressly indicated that the Act was based on a similar Florida statute. The bill analysis recognizes that "[f]or many years the state of Florida has used a method of arbitration with an unbiased third party investigation and opinion" and the "American Seed Trade Association has recommended to each of its member states that they work to pass measures similar to Florida's." *See* HOUSE COMM. ON AGRIC. AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). At the time the Texas Seed Arbitration Act was enacted, the Florida statute provided that:

> [w]hen any farmer is damaged by the failure of ... seed to produce or perform as represented by the label ..., *as a prerequisite to his right to maintain a legal action* against the dealer from whom such seed was purchased, such farmer shall make a sworn complaint. ... The *complaint shall be filed with the department,* and a copy of the complaint shall be served on the dealer by certified mail, *within such time as to permit inspection of the crops, plants, or trees* by the seed investigation and conciliation council or its representatives and by the dealer from whom the seed was purchased.

FLA. STAT. ANN. § 578.26(1)(a) (1989) (emphasis added).

The Florida and Texas statutes are substantially similar—both provide that the

seed purchaser or farmer must file a complaint or submit the claim to arbitration "as a prerequisite to [the purchaser's] right to maintain a legal action" against the dealer or labeler. Both statutes require the complaint to be filed in a timely manner so that it can be appropriately investigated and the crops can be inspected.

"[I]t is a generally accepted rule of statutory construction that when the Legislature adopts a 'foreign' statute it also adopts the construction of that statute by the foreign jurisdiction occurring prior to the Texas enactment." *State v. Moreno*, 807 S.W.2d 327, 332 n. 5 (Tex.Crim.App. 1991); *see also City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 360 (Tex. 2000); *Tex. Dep't of Pub. Safety v. Gilbreath*, 842 S.W.2d 408, 412 (Tex.App.—Austin 1992, no writ). The Florida Supreme Court construed Florida's seed act in 1983 in *Ferry–Morse Seed Co. v. Hitchcock*, 426 So.2d 958 (Fla.1983).[1] Just as in this case, the farmer in *Hitchcock* waited over two years after discovering the problem to bring suit alleging breach of warranty and negligence, and made no attempt to comply with the statutory requirements. The Florida Supreme Court held that the farmer's claims were inextricably bound to the statute's labeling requirements, and that by failing to comply with the statutory requirements, the farmer was barred from bringing suit for damages. *Id.* at 961.

The Texas Legislature enacted Chapter 64 in 1989, well after the Florida Supreme Court issued its decision construing Florida's seed act. Accordingly, we should presume that the Legislature intended to adopt Florida's construction of its statute,

so long as the Florida and Texas statutes are substantially similar and our statute does not reflect a contrary intent. *See Sharifi v. Young Bros.*, 835 S.W.2d 221, 223 (Tex.App.—Waco 1992, writ denied). As noted, the acts are substantially similar, and neither the Texas statute itself nor the available legislative history indicates a contrary intent.

The only notable difference between the Texas and Florida statutes is the provision in section 64.004 that:

> [t]he court may ... take into account any findings of the board of arbitration with respect to the failure of any party to cooperate in the arbitration proceedings, including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.

Tex. Agric. Code § 64.004. Both the Court and Wilkins contend that Wilkins's delay in filing his arbitration complaint does not bar his suit because the statute specifically addresses this problem by allowing the trial court to take such delays into account. However, because that interpretation allows Wilkins to completely circumvent Chapter 64's arbitration requirement, it simply cannot be an accurate application of section 64.004.

To the contrary, section 64.004 deals with the situation in which the complaint *is* filed within the time necessary to permit effective inspection under field conditions, but the seed purchaser's delay in filing nevertheless affects the investigation. A purchaser could certainly delay filing an arbitration complaint for many months yet still file while the seeds are under field conditions. For example, if the problem became apparent early in the season but

---

1. Florida's 1977 Act, which was at issue in *Ferry–Morse*, was similar to its 1989 version except that it required the farmer to file a sworn complaint with the department of agriculture within 10 days after the problem became apparent. Fla. Stat. Ann. § 578.26(1) (1977).

the farmer delayed submitting the claim to arbitration until after the heat of the summer, the delay could affect the Board's investigation. Section 64.004 allows the trial court to consider such a delay; it does not allow the court to completely ignore the statute's timeliness requirements. Moreover, section 64.004, by its terms, applies only to a complaint "that has been the subject of arbitration under [Chapter 64]." Because Wilkins's complaint was not arbitrated—and could not have been under the terms of the statute—section 64.004 does not apply.

Construed in this manner, section 64.004 is consistent with the Act's purpose and with the conclusion that a purchaser's failure to file an arbitration complaint within the time necessary to permit inspection during field conditions is a bar to suit. But the Court would rather rely on this one provision to gut the purpose of the Act. Rather than interpreting this single sentence in a manner entirely inconsistent with the Act's purpose of allowing an independent third-party investigation, we should interpret it consistently with the Act as a whole. *See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex.2000) (stating that we do not construe statutory language in isolation but in the context of the entire statutory scheme). And, when two constructions are possible, we should choose the one most consistent with the Act's purpose over the construction completely at odds with it.

The Court's construction of the Act renders meaningless section 64.006(a)'s requirement that the arbitration complaint be submitted within the time necessary to permit effective inspection of the plants under field conditions. Relying on the fact that the Act does not expressly state that *the Board* must conduct the field inspection, the Court reasons that "the Act pro-vides that a complaint must be filed in time to 'permit an effective inspection of the plants under field conditions,' thus permitting the parties to inspect under field conditions and provide their reports to the Board." 47 S.W.3d at 507 (citations omitted). But this reasoning makes no sense. The timing requirement must have been intended to allow *someone* to conduct a field inspection. According to the Court, that someone is simply "the parties." But surely the Act's timeliness requirement was not included to allow the farmer to conduct a field inspection, since the farmer has access to his fields and can conduct an inspection at any time. Accordingly, the requirement must have been intended to permit the Board or the seed seller to conduct an inspection. Since the Act's purpose is to allow a third party investigation and the Board employs its own field inspectors, the only conclusion is that the Legislature intended to permit the Board to conduct an inspection. But under the Court's interpretation, there would be no problem even if *no one* conducted a field inspection and the farmer waited until well after the crops had been harvested to file the arbitration complaint so that no field inspection could be performed. Or, the farmer could conduct a field inspection but then wait until after field conditions to file the arbitration complaint so that the *only* field inspection the Board could consider would be the farmer's.

The Court's construction reads section 64.006(a)'s timeliness requirement right out of the Act. To be consistent with both the Act's language and its purpose, I would hold that Wilkins's failure to submit his claim to arbitration within the requisite time period bars him from maintaining a legal action against Helena.

**II**

Wilkins argues that, regardless of whether the Act bars certain claims that

have not been arbitrated, the jury's verdict can be sustained on the basis of the DTPA unconscionability and misrepresentation causes of action, which he contends are not subject to the Act's arbitration requirement. Wilkins obtained favorable jury findings on his claims for breach of warranty, DTPA unconscionability, and DTPA oral misrepresentations. Wilkins argues that, even if the breach of warranty claim is barred by his failure to arbitrate, the Act does not bar his DTPA unconscionability and misrepresentation claims because the statute requires only claims based on the label, warranty, or negligence to be submitted to arbitration, and his DTPA claims are not based on the label, warranty, or negligence.

If Wilkins is correct, plaintiffs could easily circumvent the Act simply by recharacterizing their claims as DTPA claims. This would render the Act wholly ineffective and would undermine the legislative intent. *Cf. Sorokolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex.1994) ("Claims that a physician or health care provider was negligent may not be recast as DTPA actions to avoid the standards set forth in the Medical Liability and Insurance Improvement Act."). The Act's language is broad—it applies whenever a seed purchaser claims to have been damaged "by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached ... or as a result of negligence." Tex. Agric. Code § 64.002(a). The Business and Commerce Code—the same code in which the DTPA is found—defines warranties to include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and "[a]ny description of the goods which is made part of the basis of the bargain." Tex. Bus. & Com.Code § 2.313(a)(1),(2). Wilkins's claims for DTPA misrepresentation and unconsciona-

bility fall within the scope of this definition.

In the jury charge, the DTPA misrepresentation claim defined "false, misleading, or deceptive act or practice" as "representing that Cherokee seed had or would have characteristics that it did not have" or "representing that Cherokee seed was of a particular quality if it was of another." These representations fall within the definition of warranty, and, although couched as a DTPA misrepresentation claim, the underlying nature of the complaint is that the seeds did not produce or perform as represented. *See Sorokolit*, 889 S.W.2d at 242 (holding that the underlying nature of the claim, not its label, determines whether section 12.01(a) of the Medical Liability and Insurance Improvement Act prevents suit for violation of the DTPA). Wilkins's DTPA unconscionability claims are also predicated on Helena's representations concerning the Cherokee seed. The evidence supporting Wilkins's DTPA misrepresentation and unconscionability claims is the same evidence supporting his breach of warranty claims. Because all of Wilkins's claims are so significantly factually intertwined, they should be arbitrated together. *Cf. Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 271 (Tex.1992) (requiring arbitration of factually intertwined contract and misrepresentation claims in contractual arbitration context). Accordingly, Wilkins's DTPA claims are included within the Act's arbitration requirement.

### III

Wilkins argued in the trial court that construing the Act to bar his legal action would violate the Open Courts provision of the Texas Constitution. *See* Tex. Const. art. I, § 13. We should, if possible, interpret statutes in a manner that avoids constitutional infirmities. *Owens Corning v. Carter*, 997 S.W.2d 560, 577 (Tex.1999).

The Attorney General has concluded, and I agree, that Chapter 64's arbitration requirements do not on their face violate the Open Courts provision of the Texas Constitution. Op. Tex. Att'y Gen. No. DM–3 (1991). As noted in that decision, Chapter 64 does not purport to abolish the right of seed performance disputants to obtain redress in court. *Id.* The arbitration is nonbinding, and seed purchasers are free to pursue their claims in court after the arbitration. Moreover, Chapter 64's arbitration requirements are certainly not unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Id.; see Carter,* 997 S.W.2d at 573; *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex. 1983).

The Attorney General did caution, however, that the Act could raise Open Courts questions as applied to some cases. Op. Tex. Att'y Gen. No. DM–3 (1991). In particular, the Attorney General pointed out that the Open Courts provision could limit the application of section 64.006(a)'s requirement that the arbitration complaint be filed in time to permit inspection of the plants under field conditions. *Id.* I agree that this requirement might arguably violate the Open Courts provision as applied to cases in which the Act's complaint-filing time period has expired before the seed purchaser has a reasonable opportunity to discover the problem. But where, as here, the seed purchaser discovers the problem while the seeds are under field conditions (and conducts his own independent investigation of the crops in the field), is aware of the arbitration requirement, and has ample opportunity to file his complaint in a timely manner but simply fails to do so, the Open Courts provision is satisfied.

\* \* \* \* \*

Wilkins knew of the potential problem with the Cherokee seed within plenty of time to file a complaint with the Board during the requisite time period. Although he allowed some experts to investigate his crops under field conditions, he failed to file a complaint with the Board to allow the neutral third-party investigation required by the Act. Because Wilkins failed to submit his complaint within the requisite time period, the Board properly concluded that the complaint did not qualify for arbitration under the Act's plain language. And because arbitration is a prerequisite to Wilkins's right to maintain a legal action for his claims that he has been damaged by the failure of the seed to produce or perform as represented, Wilkins's claims are barred. The Court nevertheless decides that they are not. Because that decision contradicts the Act's plain language and undermines its purpose, I dissent.