TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00182-CV






City of Pflugerville, Texas, Appellant


v.


Capital Metropolitan Transportation Authority, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. GV100065, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING





O P I N I O N




 The City of Pflugerville withdrew from the Capital Metropolitan Transportation
Authority ("Capital Metro"), which led to this dispute as to how Pflugerville's financial obligation
to Capital Metro should be calculated upon withdrawal. At issue in this case is whether multi-year
contracts providing that funding is subject to budget appropriation should be included in the
computation of a withdrawing city's financial obligation. Pflugerville asserts that such contracts
were not properly included as "contractual obligations," while Capital Metro contends that they
were. See Tex. Transp. Code Ann. § 451.611(b)(2) (West 1999). This question turns upon statutory
interpretation and was presented to the trial court on cross-motions for summary judgment. Because
we agree with Capital Metro's interpretation of the statute, we affirm the district court's summary
judgment.


BACKGROUND


 Capital Metro was created pursuant to a confirmation and tax election conducted in
1985. See id. §§ 451.656, .659, .661 (West 1999). Pflugerville, along with Austin and several other
surrounding jurisdictions, approved the creation of the authority and the levy of a transit-authority
sales tax to support it. Pflugerville continued to be a participant member until 2000, when it
withdrew pursuant to an election conducted under chapter 451 of the transportation code and chapter
67 of the election code. See id. §§ 451.603-.609 (West 1999); see generally Tex. Election Code
Ann. §§ 67.001-.017 (West 2003).

 When a city withdraws from a transit authority, the transportation code requires
computation of the city's net financial obligation to the authority as of the date of withdrawal. See
Tex. Transp. Code Ann. § 451.611 (West 1999). To arrive at this figure, the city's apportioned share
of the authority's assets is subtracted from its apportioned share of the authority's gross financial
obligations. See id. § 451.611(a). Included in the calculation of gross financial obligations is the
authority's "outstanding contractual obligations for capital or other expenditures, including
expenditures for a subsequent year, the payment of which is not made or provided for from the
proceeds of notes, bonds, or other obligations." See id. § 451.611(b)(2) (emphasis added). If the city
has a positive net financial obligation, the Comptroller continues to collect the transit-authority sales
tax in the city until the obligation is satisfied. See id. § 451.613 (West 1999). The statutory scheme
allows for an overcollection of transit sales taxes after a city withdraws because changes in sales tax
rates occur at the end of calendar quarters, and it is virtually impossible to stop collections at the
precise instant when enough money has been collected to satisfy the city's net financial obligation. 
If the amount of funds collected from post-withdrawal taxes exceeds the city's net financial
obligation, the authority then refunds to the city the amount by which such taxes exceed its net
obligation. See id. § 451.614(a) (West 1999).

 In this case, Capital Metro calculated Pflugerville's net financial obligation as
$73,966. Transit-authority sales taxes continued to be collected in Pflugerville until this obligation
was satisfied and the transit sales tax ceased being levied. Capital Metro subtracted Pflugerville's
net financial obligation from the post-withdrawal collections and remitted the excess of $301,791
to Pflugerville. Pflugerville contends that Capital Metro improperly inflated the calculation of its
outstanding obligations by including certain multi-year contracts that provide "funding by Capital
Metro is subject to appropriation of funds in the annual budget." Pflugerville insists that all multi-year obligations with this "subject-to-appropriation" clause are not legally binding contractual
obligations. The omission of these multi-year contractual obligations would substantially reduce
Pflugerville's net financial obligation to Capital Metro.

 Pflugerville filed a declaratory judgment suit in Travis County district court seeking 
a declaration that the phrase "contractual obligations" in section 451.611(b)(2) includes only legally
binding promises for payment, to the exclusion of multi-year contracts providing that performance
is contingent upon annual appropriation of funds. (1) Pflugerville and Capital Metro filed cross-motions for summary judgment; the district court granted Capital Metro's motion. This appeal
followed.


DISCUSSION


Standard of review

 Because the propriety of a summary judgment is a question of law, we review the trial
court's decision de novo. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994); Texas Dep't
of Ins. v. American Home Assurance Co., 998 S.W.2d 344, 347 (Tex. App.--Austin 1999, no pet.). 
Similarly, statutory construction is a question of law for the court to decide. See Texas Dep't of
Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002). We therefore review a summary judgment
on the basis of statutory construction de novo.

 When parties file cross-motions for summary judgment, each party in support of its
motion necessarily takes the position that there is no genuine issue of fact in the case and that it is
entitled to judgment as a matter of law. Ackermann v. Vordenbaum, 403 S.W.2d 362, 364 (Tex.
1966). If one motion is granted and the other denied, we must review the summary judgment
evidence presented by both sides and determine all questions presented. Commissioners Court of
Titus County v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). We may either affirm the judgment or reverse
and render the judgment that the trial court should have rendered. Jones v. Strauss, 745 S.W.2d 898,
900 (Tex. 1988).


Construction of "contractual obligations"

 In construing a statute, the court's objective is to determine and give effect to the
legislature's intent. Albertson's, Inc. v. Sinclair, 984 S.W.2d 958, 960 (Tex. 1999). The first step
in determining the legislature's intent is to look at the statute's language with the presumption that
the legislature intended the plain and common meaning of its words. See id. In conducting a plain
meaning inquiry, we are to presume that every word in a statute has been used for a purpose and that
each word, phrase, clause, and sentence should be given effect. Whitelaw v. State, 29 S.W.3d 129,
131 (Tex. Crim. App. 2000); see State v. Evangelical Lutheran Good Samaritan Soc'y, 981 S.W.2d
509, 511 (Tex. App.--Austin 1998, no pet.). We look to the entire act in determining the
legislature's intent with respect to a specific provision. Taylor v. Firemen's & Policemen's Civil
Serv. Comm'n, 616 S.W.2d 187, 190 (Tex. 1981). A court should not give any ambiguous statutory
term a meaning that is out of harmony or inconsistent with other provisions in the statute. See
Needham, 82 S.W.3d at 318. Besides looking to the statute's language, a court may consider other
factors to determine the legislature's intent, including: the object sought to be obtained, the
legislative history, the consequences of a particular construction, and administrative construction of
the statute. Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001); see Tex. Gov't Code
Ann. § 311.023 (West 1998).

 At issue in this case is the meaning of the phrase "contractual obligations" as it
appears in the statute: "outstanding contractual obligations for capital or other expenditures,
including expenditures for a subsequent year, the payment of which is not made or provided for from
the proceeds of notes, bonds, or other obligations." Tex. Transp. Code Ann. § 451.611(b)(2)
(emphasis added). "Contractual obligations" is not defined anywhere in the transportation code. 
Pflugerville asserts that the phrase includes only legally binding promises for payment or
performance and therefore excludes contracts with the following language: "funding after first year
of contract is subject to revenue availability and appropriation of funds in the annual budget
approved by Capital Metro Board of Directors" and "any purchase . . . is contingent upon the
continued availability of appropriations and is subject to cancellation, without penalty, either in
whole or in part, if the funds are not appropriated by the Capital Metro Board of Directors or
otherwise made available." Pflugerville asserts that contracts with such language are illusory or
merely provide Capital Metro the option to perform. Such optional and discretionary contracts are
not legally binding and thus do not fall within the plain meaning of "contractual obligations." 
Capital Metro, on the other hand, asserts that "subject to appropriation" contracts should be included
in calculating the transit authority's contractual obligations because: the phrase means merely an
obligation that arises from a contract, the "subject-to-appropriation" condition exists even without
such explicit language in a contract, and the legislature intended to include such multi-year contracts.

 Virtually all multi-year contracts entered into by Capital Metro have subject-to-appropriation clauses. Capital Metro claims that it has conformed its contracts to the requirements
of Texas law by incorporating these subject-to-appropriation clauses, and that the condition of annual
appropriation would exist anyway as a matter of law if not explicitly stated in the contract. It bases
this argument on a statute prohibiting a transit authority from conducting any business in a fiscal year
until it has adopted an annual operating budget of all major expenditures. See Tex. Transp. Code
Ann. § 451.102(a) (West 1999) ("A board shall adopt an annual operating budget of all major
expenditures by type and amount. The board shall adopt the budget before the beginning of the fiscal
year to which the budget applies and before the authority may conduct any business in the fiscal
year."). Payment on a multi-year contract necessarily falls within the ambit of "conducting
business." Because Capital Metro cannot, therefore, perform on a previously negotiated contract
until the budget has been approved and expenditures under that contract provided for in the budget,
it follows that by law a transit authority's multi-year contractual obligations are subject to yearly
budget appropriation.

 Furthermore, Capital Metro argues, many governmental entities routinely use subject-to-appropriation clauses in contracts because of constitutional limitations on the creation of debt by
cities and counties, which restrict expenditures to money from current revenues. See Tex. Const. art.
XI, §§ 5 & 7. For instance, the local government code provides that if a contract contains subject-to-appropriation language, the contract is a commitment of the local government's current revenues
only. See Tex. Loc. Gov't Code Ann. § 271.903 (West 1999). We believe that Capital Metro's use
of subject-to-appropriation clauses in multi-year contracts does nothing more than conform its
contracts to the requirements of Texas law. Their use neither gives Capital Metro the unbridled
discretion to perform nor renders the contracts illusory. Therefore, Capital Metro's obligations under
multi-year, subject-to-appropriation contracts are legally binding.

 Pflugerville argues that only Capital Metro's operating expenses, as opposed to
capital or other expenses, are subject to budget appropriation by law. It bases this argument on the
following limitation upon transit authorities: "An authority may not spend for operations money in
excess of the total amount specified for operating expenses in the annual operating budget." See
Tex. Transp. Code Ann. § 451.103 (West 1999) (emphasis added). Pflugerville urges that because
the statute singles out operating expenditures, other kinds of expenditures are not by law subject to
budget appropriation. We conclude that this statute serves merely as a ceiling on annual operations
spending; it does not detract from the broad prohibition on conducting business until after an annual
budget of all expenditures has been approved. Therefore, we agree with Capital Metro that the
condition of appropriation of funds in a transit authority's budget exists by law, even without an
explicit subject-to-appropriation clause in such a contract. Based on this foundation, we proceed to
consider the legislative intent behind the phrase "contractual obligations."

 The transportation code's enumeration of five detailed components of an authority's
outstanding obligations indicates a legislative intent that the scope of "obligation" be comprehensive:


(b) An authority's outstanding obligations under Subsection (a)(1)(A) is the sum of:


 (1) the obligations of the authority authorized in the budget of, and contracted
for by, the authority;


 (2) outstanding contractual obligations for capital or other expenditures,
including expenditures for a subsequent year, the payment of which is not
made or provided for from the proceeds of notes, bonds, or other
obligations;


 (3) payments due or to become due in a subsequent year on notes, bonds, or
other securities or obligations for debt issued by the authority;


 (4) the amount required by the authority to be reserved for all years to comply
with financial covenants made with lenders, note or bond holders, or other
creditors or contractors; and


 (5) the amount necessary for the full and timely payment of the obligations of
the authority, to avoid a default or impairment of those obligations,
including contingent liabilities.


Tex. Transp. Code Ann. § 451.611(b). The first component covers contracts already authorized to
be performed within the current budget. The second component covers expenditures not yet
authorized in the current budget--obligations incurred under contracts entered into after the current
year's budget has been authorized or that extend performance beyond the current year. It broadly
covers capital and other types of expenditures, but not those that will be paid through the proceeds
of bonds and notes. Because this component refers to expenditures for subsequent years, multi-year
contracts necessarily fall within its ambit. The distinction between the first and second components
is significant: the first refers to obligations authorized in the budget while the second refers to
obligations for subsequent years. Payment on multi-year contracts due beyond the current fiscal year
cannot fall within the first component because such payments cannot by law be authorized in the
current budget; such expenditures can only be swept into the computation of outstanding obligations
under the second component, which specifically addresses expenditures for subsequent years. The
third component covers payments outstanding under bonds and notes, while the fourth covers the
reserves required to secure those payments. Lastly, the fifth component of outstanding obligations
includes any contingent liabilities. Reading all the components together, as a court should when
construing part of a statute, we conclude that the intent was to encompass every potential expenditure
by a transit authority as an outstanding obligation. In the context of the statute, the phrase
"contractual obligations" is reasonably interpreted to mean any obligation undertaken by a transit
authority in the form of a contract. By specifically referring to obligations extending beyond the
current budget year, the legislature intended to include multi-year contracts. Because virtually all
multi-year contracts entered into by Capital Metro contain subject-to-appropriation clauses, the
phrase "contractual obligations" would have little or no meaning if such contracts were not to be
included in the computation of an authority's outstanding obligations. Courts should avoid a
statutory construction that renders all or part of a statute meaningless. See Continental Cas. Ins. Co.
v. Functional Restoration Assocs., 19 S.W.3d 393, 402 (Tex. 2000).

 Pflugerville asserts that the statute's reference to obligations for "subsequent years"
is not rendered meaningless if it is read as "other non-operating expenditures . . . for subsequent
years." However, Pflugerville's reading of the statute would require adding language that is not in
the statute. Its reading is based on its argument that only operating expenses are by law subject to
appropriation. We have already rejected this proposition. We have also concluded that the
legislative intent was broad--the term "other expenditures" would necessarily include operating
expenditures in the absence of a clear legislative intent to exclude them. Furthermore, because we
conclude that all expenses of a transit authority--operating, capital, and other--are subject to annual
budget appropriations, we reject Pflugerville's arguments with respect to the statute's plain meaning.

 The legislative history supports our interpretation. Pflugerville argues that the intent
behind the refund provision was fairness towards the withdrawing city. Capital Metro asserts that
the original intent behind the calculation of a withdrawing community's net financial obligation was
to protect creditors and to ensure that the withdrawal of one unit would not impair the obligation of
contracts entered into by the authority--the refund provision was added two years later with a
different yet non-conflicting intent. We agree.

 When the statute was first enacted, the enumeration of the five components of an
authority's financial obligations was preceded by the following language:

The withdrawal of a unit of election . . . is subject to the requirements of the federal
and state constitutions prohibiting the impairment of contracts. Taxes shall continue
to be collected in the unit of election until an amount of taxes equal to the total
financial obligations of the unit of election to the authority has been collected.



Act of May 26, 1987, 70th Leg., R.S., ch. 790, § 7, sec. 6F(l), 1987 Tex. Gen. Laws 2774, 2779 (now
codified as Tex. Transp. Code Ann. § 451.611(b) (West 1999), cited language deleted in non-substantive codification of statute). Pflugerville's argument relies on a bill analysis and floor report
of the 1989 amendment to the statute creating a withdrawing city's right to a refund for its citizens'
overpayment in taxes: "This bill . . . establish[es] that, on withdrawal from a transportation authority,
a unit of election is entitled to a refund of any amount by which its share of unencumbered assets
exceeds its share of financial obligations," House Comm. on Transportation, Bill Analysis, Tex.
H.B. 563, 71st Leg., R.S. (1989) (emphasis added), and "[a] community that wants to opt out of a
transit service it does not use should be allowed to vote on the issue at any time and should be able
to get back its fair share of what it put in to the system." House Study Group Daily Floor Report,
House Research Organization, Tex. H.B. 563, 71st Leg., R.S., (Apr. 4, 1989), at 16-19 (emphasis
added).

 The statute as originally enacted clearly stated its purpose of preventing the
impairment of contracts. A transit authority takes into consideration its participating members and
the needs of the entire authority's population when negotiating multi-year contracts. If a
withdrawing city did not pay its proportionate share of outstanding contractual obligations, the
authority would conceivably not have enough funds to pay for the goods or services and would then
be less likely to perform its contractual obligations. (2) Despite the words "fair" and "share" used to
promote the refund provision in 1989, the refund provision does not contradict the legislature's
original intent to require a withdrawing city to continue to pay taxes until its net financial obligation
has been paid in full. We reject Pflugerville's reliance on the legislative history and conclude that
the history, rather, weighs in favor of including subject-to-appropriation contracts as "contractual
obligations."

 Pflugerville's argument that our interpretation allows Capital Metro to sign high-dollar, multi-year contracts as a means to avoid giving refunds to withdrawing cities is merely a
hypothetical problem that could be dealt with on a case-by-case basis if and when such abuse occurs. 
Although we are sympathetic to Pflugerville's argument that by including subject-to-appropriation
contracts in the formula, the withdrawing city will in effect be subsidizing the remaining authority
members, the same "subsidy" would also result from non-subject-to-appropriation contracts. Any
expenditures made by Capital Metro after a city withdraws--whether obligated by contracts without
conditions or by contracts where funding is subject to appropriation--will benefit solely the
remaining members. We thus hold that subject-to-appropriation contracts are properly included in
a transit authority's computation of its "contractual obligations."


CONCLUSION


 The phrase "contractual obligations" as it appears in section 451.611(b)(2) of the
transportation code includes obligations undertaken by a transit authority arising under multi-year
contracts that are subject to appropriation of funds in the budget of a transit authority. We affirm
the trial court's grant of summary judgment in Capital Metro's favor.



 

 Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: October 16, 2003

1. In district court, Pflugerville contested the inclusion of two other types of contracts: those
where future payments or purchases are (1) contingent on Capital Metro applying for and obtaining
a federal grant and (2) subject to termination at the will or convenience of Capital Metro. Because 



Pflugerville raises only the issue of the subject-to-appropriation contracts on appeal, we restrict our
analysis to these kinds of contracts.
2. We recognize that due to the decrease in population and service area resulting from the
withdrawal of a city a transit authority will perhaps have less need for certain of its contracted-for
goods and services, and thus a withdrawing city may end up paying for goods and services that the
authority later does not purchase. However, the record reflects that Capital Metro has yet to cancel
a contract because of failure to budget funds for it.