NO. 12-02-00019-CV


 

IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


MICHAL K. WILLIAMS AND
§
 APPEAL FROM THE 392ND

MARY WILLIAMS,

APPELLANTS





V.
§
 JUDICIAL DISTRICT COURT OF


HEUSER CHIROPRACTIC,

DR. CHARLES H. HEUSER,

DR. NATHAN NIX, CHIRO HEALTH,

INC., AND UNKNOWN STAFF

OF HEUSER,

APPELLEES
§
 HENDERSON COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellants Michal K. Williams ("Michal") and Mary Williams ("Mary") (collectively, the
"Williamses") appeal the trial court's grant of a directed verdict and entry of a take-nothing judgment
in favor of Appellees Heuser Chiropractic, Dr. Charles H. Heuser, Dr. Nathan Nix ("Dr. Nix"), Chiro
Health, Inc., and the unknown staff of Heuser Chiropractic. (1) In five issues, the Williamses contend
the trial court erred in granting a directed verdict on their DTPA claims and that the jury's finding
of no negligence is against the great weight and preponderance of the evidence. We affirm.


Background

 In the fall of 1997, Michal Williams began to experience stiffness and pain in his lower back
and side. At that time, he was not experiencing any neck pain. During that same time period,
Michal received a coupon in the mail from Heuser Chiropractic in Tyler that advertised "Free
chiropractic treatments and refreshments on 1st visit. All adjustments and therapies no charge. All
x-rays $10.00 each if needed." 

 On November 3, Michal went to Heuser Chiropractic in order to receive treatment. During 

his first visit, Dr. Nix examined him and took x-rays of his hip area. After the x-rays were taken,
Dr. Nix explained to Michal that he was suffering from degenerative joint disease and showed him
on a skeletal model the areas that were painful. Dr. Nix also explained the future ramifications of
the disease, stating that Michal was going to develop problems with his bladder, colon, prostate
gland, and "sex organ" if he did not receive treatment. During this visit, Michal did not complain
to Dr. Nix that he was experiencing any neck pain.

 At some point during the visit, one of the staff members of Heuser Chiropractic explained
to Michal that in order to treat this condition, he needed thirty visits at $110.00 per visit. If Michal
paid for the treatment up front, he would receive a thirty-three percent discount. Dr. Nix then told
Michal that after the thirty visits, he would be "as good as new" and "back to normal." At the end
of the visit, Michal signed a contract accepting Heuser's offer of services. Michal made twenty-five
visits to Dr. Nix. He did not have to pay for the entire thirty visits because the contract he signed
stated that he had no obligation to pay for any service that he did not receive.

 At around the eighth or ninth visit, Michal received chiropractic manipulations on his neck
from Dr. Nix and Dr. Dwayne Kubeka ("Dr. Kubeka"). (2) Prior to those cervical manipulations, Dr.
Nix never x-rayed Michal's neck. After a few of the cervical manipulations were performed, Michal
complained to Dr. Nix that he was "walking funny" and that his "reflexes were weird." On the
twelfth visit, Michal told Dr. Kubeka that he had "weird sensations running through his right leg"
and on the fourteenth visit, he told Dr. Kubeka that his legs were "jumping like frogs." During one
of the visits, Michal received electrical muscle stimulation and suffered a burn on his back about two
to three inches in width. When he received the burn from the electrical stimulation unit, Michal
testified that he had told the assistant to "turn it up" because he wanted a strong treatment for his
back pain. 

 On December 20, the twentieth visit, Michal complained to Dr. Nix that he had developed
numbness in his left hand. Dr. Nix never took an x-ray of Michal's neck at any time after Michal
voiced his complaints about the problems he was having in his legs and hand. Michal then stopped
going to Heuser Chiropractic because he "was in pain from [his] neck down to [his] tailbone." 

 When Michal did not return to Heuser Chiropractic for treatment, he began receiving phone
calls from the office staff, telling him that he needed to come back for treatment because his
condition was not going to get any better "if [he sat] on the couch." On January 24, 1998, Michal
went back to Dr. Nix and received another cervical manipulation. Dr. Nix never took an x-ray of
Michal's neck at any time prior to or after this cervical manipulation. Once this visit had concluded,
Michal decided he did not want to receive any further treatment from Heuser Chiropractic because
he was not getting any better. At trial, however, Michal conceded that he told Dr. Nix that he was
"ninety percent better" after this last visit.

 On June 4, 1998, Michal went to see Dr. Michael Russell, an orthopedic surgeon, because
he was having reflex problems in his hands, falling, stumbling, and losing his balance. Michal
thought these problems were caused by the treatment he received at Heuser Chiropractic. Dr. Russell
took x-rays and had an MRI performed, as well as other neurological tests. The MRI revealed that
Michal was suffering from cervical osteophytes (bone spurs), stenosis (narrowing of the middle of
the vertebra that the spinal cord runs through), a cervical disc herniation, and lumbar disc
degeneration. In order to alleviate Michal's problems, Dr. Russell performed an anterior cervical
discectomy with fusion, meaning that he took the disc out, removed the bone spurs from the spinal
cord, and then fused that level with bone taken from Michal's hip. 

 On November 5, 1998, the Williamses sued Heuser Chiropractic, Dr. Heuser, Dr. Nix, Chiro
Health Inc., Dr. Kubeka, Linda Kenshalo, and the unknown staff of Heuser Chiropractic, alleging
causes of action for negligence, informed consent, assault and battery, violations of the Deceptive
Trade Practices Act ("DTPA"), breach of the warranty of cure, and civil penalties under section
36.25 of the Texas Business and Commerce Code for failing to file an assumed business name with
the Texas Secretary of State. (3) On April 9, 2001, the Williamses amended their original petition,
adding causes of action for an "unconscionable course of action" under the DTPA and illegal pricing
practices, as well as allegations that Chiro Health Inc. was the "corporate veil" of Dr. Heuser. 
Specifically, the Williamses alleged that as a result of chiropractic manipulation, one or more of the
appellees caused a disc in Michal's neck to rupture, necessitating surgical intervention.

 On April 17, 2001, the Williamses' case went to trial, and Appellees moved for a directed
verdict on the Williamses DTPA, negligence, and informed consent causes of action. Appellees
based their motion on the fact that there was no evidence or, alternatively, insufficient evidence
relating to the proximate cause of the Williamses' damages. Appellees also argued that 1) the DTPA
causes of action were precluded by section 17.49(c) of the DTPA, and 2) no evidence existed to
support the allegation that any violation of the DTPA by Appellees was a producing cause of the
Williamses' damage. 

 After hearing argument from both sides, the trial court granted Appellees' motion for a
directed verdict. Once the case concluded, the pertinent three questions posed to the jury were:


 1. Did the negligence, if any, of Dr. Nathan Nix proximately cause injury to Michal Williams?

 

 2. Did Dr. Nathan Nix fail to obtain informed consent from Michal Williams for cervical
manipulation?

 

 "Informed consent" means consent given by a patient to whom such risks incident to cervical
manipulation have been disclosed as would be disclosed to the patient by a chiropractor of
ordinary prudence under the same or similar circumstances.

 

 3. If those risks had been so disclosed, would a person of ordinary prudence have refused such
treatment under the same or similar circumstances?



 The jury answered "no" to the negligence question and "yes" to the informed consent
question, but answered negatively to the third question, inquiring whether a person of ordinary
prudence would have refused such treatment. The jury did not answer the other four questions,
which were conditionally submitted upon affirmative answers to the first and third questions.

 On May 18, the Williamses filed an amended motion for new trial, which the trial court
denied on November 21. On December 26, the Williamses timely filed a notice of appeal. On
appeal, the Williamses contend that the trial court erred in granting Appellees' motion for a directed
verdict on their DTPA causes of action and that the jury's verdict on negligence and informed
consent is against the great weight and preponderance of the evidence. 


Review of the Directed Verdict on the Williamses DTPA Claims (4)

Standard of Review 

 A court may instruct a verdict if no evidence of probative force raises a fact issue on the
material questions in the suit. Prudential Ins. Co. of Am. v. Financial Review Servs., Inc., 29
S.W.3d 74, 77 (Tex. 2000). A directed verdict for a defendant may be proper in two situations. 
First, a court may direct a verdict when a plaintiff fails to present evidence raising a fact issue
essential to the plaintiff's right of recovery. Id. Second, a trial court may direct a verdict for the
defendant if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's
cause of action. Id. In reviewing a directed verdict, we examine the evidence in the light most
favorable to the person suffering the adverse judgment. Smith v. Universal Elec. Const. Co., 30
S.W.3d 435, 438 (Tex. App.-Tyler 2000, no pet.). We therefore review the record to determine if
any evidence exists to support the Williamses' DTPA causes of action. 

The Testimony

 Dr. John Martin, a chiropractor in Austin, testified for the Williamses. Dr. Martin has been
practicing as a chiropractor for thirty-seven years, and is a co-author of the "Texas Guidelines for
Chiropractic Quality Assurance." Dr. Martin testified that the proper standard of care for performing
a cervical manipulation is to do some type of examination and testing before the cervical
manipulation takes place. Specifically, the proper examination would include testing the patient's
range of motion, a Valsalva's maneuver (the patient tightens his neck muscles to determine if there
is "nerve root involvement in the neck"), a Soto Hall test (to determine whether a herniated disc is
present), reflex tests, and grip tests (to determine whether a nerve is pinched). Dr. Martin testified
that after reviewing Michal's records, he did not see anywhere that Dr. Nix performed any of these
tests before Michal's cervical spine was manipulated. Dr. Martin further stated that he believes the
failure to perform these tests falls below the standard of care. 

 With regard to informed consent, Dr. Martin testified that informed consent means that a
chiropractor has to "tell the patient the possible consequences of [the] care" and to "inform the
patient fully as to what's going to happen or might happen" if the care is continued. Dr. Martin
stated that Dr. Nix's records of Michal's treatment do not include any mention of Michal receiving
the necessary information prior to the cervical manipulation and that this failure to give Michal the
information falls below the standard of care. Taking into account Michal's bone spurs at the C5-C6
level, Dr. Martin believes that the cervical manipulation performed by Dr. Nix caused Michal harm. 
Specifically, Dr. Martin testified that when Michal presented with complaints of numbness in his left
hand, it was reasonably probable that the numbness was related to the manipulation at the C5-C6
level. Dr. Martin also stated that when a patient receives electrical muscle stimulation, the
stimulation should not be so intense as to burn a patient.

 Dr. Martin further testified that Michal's pre-existing cervical spurring at the C5-C6 level,
along with a bulging disc at the same level, could have been aggravated by the cervical manipulation. 
When asked whether thirty was an excessive number of visits, Dr. Martin stated that there is "no
documented literature on how long you treat anything." Dr. Martin also testified that if a person with
Michal's conditions (a ruptured C5-C6 cervical disc and bone spur pressing on the spinal cord)
presented to a reasonably prudent chiropractor, the chiropractor should refer the patient to a specialist
immediately.

 Dr. Nix testified first as an adverse witness in the Williamses' case-in-chief. When asked
if Michal's cervical bone spurs would have shown up on an x-ray had he referred Michal for x-rays,
Dr. Nix replied, "Very possibly." Dr. Nix agreed that he did not perform a cervical examination on
Michal on November 10 or 17 of 1997. He also agreed that he never took an x-ray of Michal's neck. 
Dr. Nix stated that he never advised Michal of the consequences associated with manipulations of
his neck. When asked whether it is standard practice for him and Heuser Chiropractic to manipulate
persons who have cervical spurs that are effacing the spinal cord, Dr. Nix stated, "No, sir, it is not." 
Other than the range of motion test, Dr. Nix testified that he never performed any neurologic test to
determine whether Michal suffered from a degenerative neck condition. Dr. Nix also agreed that the
spurring condition in Michal's neck was far from "essentially normal," as Dr. Nix had described
Michal's neck in the December 1, 1997 notes. 

 Dr. Nix testified that had he known about the MRI results which showed that Michal had
bone spurs effacing his spinal cord, he would not have performed the cervical manipulations. Dr.
Nix also stated that he never told Michal about any of the worse-case consequences that could result
from spinal manipulation, nor did he tell him that a bone spur in his neck effacing his spinal cord
could be aggravated during spinal manipulation. Dr. Nix agreed that a patient would be frightened
about loss of sexual function, prostate problems, or kidney problems. He also agreed that paralysis
and death could possibly result from cervical manipulation. Dr. Nix testified that his conduct with
regard to Michal's neck was appropriate, even though he did not take any x-rays, and that he would
perform the same treatment again. 

 Next, Dr. Kubeka testified by deposition, and stated that he would not perform a cervical
manipulation on a person who presented with symptoms that could indicate a ruptured extruded
cervical disc. He also testified that when Michal presented with numbness in his hands, he would
not have continued, as Dr. Nix did, with more cervical manipulations. As a reasonably prudent
chiropractor, Dr. Kubeka stated that he does not approve of taking in a new patient and making a
determination on that first visit that the patient needs twenty-five treatments. Dr. Kubeka also stated
that there would be no way for Dr. Nix or Heuser Chiropractic to know after the first visit that
Michal needed to sign up for twenty-five treatments. He agreed that the burn Michal suffered on his
back during treatment was not acceptable chiropractic practice. 

 Dr. Russell testified by deposition and stated that when Michal presented on June 4, 1998,
he was complaining of lower back pain, spasms in his leg, and a jumping sensation in both hands. 
After Dr. Russell ordered an MRI, he found Michal was suffering from osteophytes, spinal stenosis,
a disc herniation in the cervical spine, as well as lumbar degeneration and osteophytes. He also
found that Michal had bone spurs that were impinging on his cervical cord. Dr. Russell determined
that Michal needed an anterior cervical discectomy, meaning taking the disc out, removing the bone
spurs from the spinal cord, decompressing the spinal cord, allowing it to go back to a more normal
shape, and then fusing that level. When asked what type of medical complications could result from
a hyperextension of the neck, Dr. Russell explained that it could cause spinal cord damage, which
results in incoordination of the hands and/or legs, weakness of the hand and/or legs, difficulty with
fine motor skills of the hands and upper extremities, and difficulty walking. Dr. Russell also stated
that Michal presented to him with some of those symptoms. 

 Dr. Russell further testified that the cervical manipulation could have, in reasonable medical
probability, caused Michal to have symptoms or aggravations that would require surgical
intervention. In Dr. Russell's opinion, such an event is what happened in Michal's case. Dr. Russell
testified that it was possible that the numbness Michal was suffering in his hands was due to the
cervical manipulations he received from Dr. Nix. Dr. Russell based his opinion that the cervical
manipulations caused Michal harm on the fact that Michal had no complaints about arm or hand
symptoms prior to the manipulation. 

 On redirect examination, Dr. Russell stated that the cervical manipulations would more
likely than not have caused the existing spurring to be pushed against the spinal cord. When asked
if he would refer a patient such as Michal, suffering from cervical spurring and stenosis, to a
chiropractor for cervical manipulations, Dr. Russell replied, "Absolutely not. . . . Because of the
possibility of damage to the spine." Dr. Russell also testified that he could not rule out the
possibility that the chiropractic treatment was the cause of Michal's symptoms that necessitated
surgery. Based on Michal's medical history, and assuming that Michal could not point to any other
activity that caused his neurologic deficits, Dr. Russell testified that in reasonable medical
probability, the chiropractic treatment was the cause of the neurologic deficits that required surgery
to repair. 

 Dr. Braden McKechnie testified next on behalf of Heuser Chiropractic and Dr. Nix. Dr.
McKechnie has been a licensed chiropractor since 1986, and is a former professor at Texas
Chiropractic College. On cross-examination, Dr. McKechnie agreed that Dr. Nix never diagnosed
the spurring at the C5-C6 level and that he manipulated the area on many occasions without the
benefit of that diagnosis. Dr. McKechnie also agreed that Dr. Nix failed to advise Michal that the
condition existed or that he had a ruptured disc at the same level. Dr. McKechnie testified that Dr.
Nix never performed any test to determine whether there was myelopathy at the C5-C6 level. When
asked if he would have conducted a neurologic examination, Dr. McKechnie said that he would more
than likely have ordered an x-ray of Michal's neck. 

 With regard to informed consent, Dr. McKechnie agreed that adverse consequences relative
to a chiropractic manipulation could occur in some forms of inappropriately-applied manipulation. 
Analysis

 In their first amended original petition, the Williamses alleged that Appellees violated the
DTPA and "breached the warranty of cure" by engaging in the following conduct:


 A. Representing that the Defendants' services had sponsorship, approval, characteristics,
ingredients, uses, benefits and quantities which they did not have.

 

 B. Representing that the Defendants' services were of [a] particular standard, quality, and grade
while actually they were of another. 


 C. Representing that the Defendants' guarantee and warranty of their services and of a cure of
his condition had rights and remedies which it did not have.

 

 D. For failure to disclose information to Plaintiff about Defendants' services which had he
known at the time of the treatment, Plaintiff would not have agreed to the treatment and at
such time Defendants failed to disclose such information to Plaintiff to induce him to enter
into the treatment program.

 

 E. Plaintiffs will also show that Defendants, in signing Plaintiff up to a 30-visit course of
treatment was excessive as to the number of visits and the need for treatment by the
chiropractor and exceeded any reasonable expectation for treating Plaintiff and became
merely a scare tactic and a motive to extract money from the Plaintiffs. The unconscionable
course of action is also exemplified by Defendants' efforts to get the Plaintiff to pay for 30
visits in cash by offering a cash discount and by luring Plaintiffs to the establishment through
Val-Pak flyers in the mail received at Plaintiffs' house in Brownsboro, Henderson County,
Texas, offering "free initial visits and examinations." The "free initial examination" was
merely an opportunity to convince Plaintiff to sign on for an unconscionable course of
treatment consisting of 30 visits to the office of Defendants.



The Williamses also alleged that this course of conduct was a producing cause of their damages and
that Appellees acted knowingly.

 Applicable Law

 The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any
trade or commerce." Tex. Bus. & Com. Code Ann. § 17.46(a) (Vernon 2003). Section 17.46(b)
is a laundry list of specifically prohibited acts. Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 501
(Tex. 2001). Section 17.46(b)(5) and 17.46(b)(7) prohibit "false, misleading, or deceptive acts or
practices including . . . representing that goods and services have characteristics, ingredients, uses,
[or] benefits . . . which they do not have" and "representing that goods or services are of a particular
standard, quality or grade . . . if they are of another." Tex. Bus. & Com. Code Ann. §§ 17.46(b)(5),
(7) (Vernon 2003). Section 17.46(b)(20) declares unlawful any representations that a "guarantee or
warranty confers or involves rights or remedies which it does not have or involve. . . ." Tex. Bus.
& Com. Code Ann. §§ 17.46(b)(20) (Vernon 2003). Former section 17.46(b)(23) prohibited 


 the failure to disclose information concerning goods or services which was known at the time of the
transaction if such failure to disclose such information was intended to induce the consumer into a
transaction into which the consumer would not have entered had the information been disclosed.



Tex. Bus. & Com. Code Ann. § 17.46(b)(23) (Vernon 2000) (renumbered as 17.46(b)(24) by Act
of June 14, 2001, 77th Leg., R.S., ch. 962, § 1, 2001 Tex. Sess. Law Serv. 962 (Vernon) (codified
as an amendment to Tex. Bus. & Com. Code Ann. § 17.46(b)). Section 17.50 provides the remedy
for violations of the laundry list provisions of section 17.46(b) and for "any unconscionable action
or course of action by any person." Tex. Bus. & Com. Code Ann. § 17.50(a)(1), (3) (Vernon 2003). 
Actionable representations may be oral or written. Wilkins, 47 S.W.3d at 502. A party need not
prove intent to make a misrepresentation under sections 17.46(b)(5) or 17.46(b)(7); making the false
representation itself is actionable. Id.

 In order to recover in a DTPA case, a plaintiff must prove that 1) the plaintiff is a consumer,
2) the defendant has engaged in false, misleading, or deceptive acts, and 3) the acts were a producing
cause of the plaintiff's injuries. Doe v. Boys Clubs of Greater Dallas, 907 S.W.2d 472, 478 (Tex.
1995). A "producing cause" showing requires some evidence that the defendant's act or omission
was a cause in fact of the plaintiff's injury and is a substantial factor which brings about the injury
and without which the injury would not have occurred. Id. 

 With regard to actionable representations, the Texas Supreme Court has recognized that
"mere puffing" or opinion statements are not actionable under sections 17.46(b)(5) or 17.46(b)(7). 
Wilkins, 47 S.W.3d at 502. An imprecise or vague representation constitutes a mere opinion. 
Autohaus v. Aguilar, 794 S.W.2d 459, 462 (Tex. App.-Dallas 1990), writ denied per curiam, 800
S.W.2d 853 (Tex. 1991). 

 Misrepresentations and Breach of Warranty 

 Specifically, the Williamses contend that the misrepresentations and warranty that they relied
on were the promises by Heuser that after thirty visits, Michal would be "as good as new" and would
be "back to normal." The Williamses argue that these promises assume that Heuser would correct
any problems in his lower back, not create new problems, such as the aggravation of the bone spurs
and degenerative disc condition and the burn Michal suffered on his back. Heuser, on the other
hand, maintains that such phrases are colloquial expressions and in order to be actionable, must be
more specific. We agree. 

 The statements made by Dr. Nix that Michal would be "as good as new" and "back to
normal" are imprecise and vague representations and were therefore Dr. Nix's opinions and puffing
on what the outcome of Michal's course of treatment would be. See Sorokolit v. Rhodes, 889
S.W.2d 239, 242-43 (Tex. 1994) (surgeon could be held liable under the DTPA for promising that
a patient's breast enhancement would look like a picture she selected). In the instant case, Dr. Nix
made no representations or warranties regarding the exact result of his treatment of Michal. 
Accordingly, the trial court did not err in granting Heuser's motion for a directed verdict with regard
to the Williamses' misrepresentation and breach of warranty claims under sections 17.46(b)(5),
17.46(b)(7), and 17.46(b)(20). 

 Failure to Disclose Information

 Former section 17.46(b)(23) required a plaintiff claiming non-disclosure under the DTPA
to prove four elements: 1) a failure to disclose information concerning goods or services, 2) which
was known at the time of the transaction, 3) if such failure was intended to induce the consumer into
a transaction, 4) into which the consumer would not have entered had the information been
disclosed. Chandler v. Gene Messer Ford, Inc., 81 S.W.3d 493, 502 (Tex. App.-Eastland 2002,
pet. denied). Nondisclosure without evidence that a defendant had knowledge of the undisclosed
information and intentionally withheld the information is not actionable. Id. There is also no duty
to disclose if a defendant fails to disclose material facts it should have known. Doe, 907 S.W.2d at
479.

 In the instant case, there is no evidence in the record to show that Dr. Nix knew of any
condition that Michal had before he began treatment. Even if Dr. Nix should have known about
Michal's pre-existing conditions and failed to diagnose them, Dr. Nix was under no duty to disclose
those facts under the DTPA because he did not have knowledge of them at the time he treated
Michal. See id. Accordingly, the trial court did not err in granting Heuser's motion for directed
verdict on the Williamses' failure to disclose claim under the DTPA.

 Unconscionable Action or Course of Action

 An "unconscionable action or course of action" means an act or practice which, to a
consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of
the consumer to a grossly unfair degree. Tex. Bus. & Com. Code Ann. § 17.45(5) (Vernon 2003). 
"Grossly" means glaringly noticeable, flagrant, complete, and unmitigated. State Farm Lloyds v.
Nicolau, 951 S.W.2d 444, 451 (Tex. 1997). There must be a showing of what the consumer could
have or would have done if he had known about the information. Peltier Enters., Inc. v. Hilton, 51
S.W.3d 616, 623 (Tex. App.-Tyler 2000, pet. denied). 

 The Williamses argue that the conduct of Heuser which constituted an unconscionable course
of action was 


 actively advertis[ing] for customers, luring them in with offers of free services. Once they had the
potential customer in the door they used x-rays, talk of nerve connections to vital organs, threats of
dire consequences if they do not provide treatment, promises of complete cure and return to
"normalcy" if the potential customer signs up for thirty visits, and at a discount too if they paid up
front. 

 

 . . . .


 Prior to Mr. Williams submitting to Heuser, he had no unusual problems or symptoms
relating to his cervical spine. In the course of the treatment with Heuser, following cervical
manipulations by Nix, he developed symptoms pointing directly to his cervical spine. Although his
bone spurs and other physiological conditions may have predated his going to Heuser, they were
asymptomatic until Heuser got a hold of him. 


 . . . .


 For Heuser to scare Mr. Williams into this extended and expensive course of treatment, all
the while telling him everything was normal, to expand the manipulations beyond the part of the spine
for which treatment had been determined to be necessary through the use of appropriate diagnostic
testing, and to accelerate and cause to become symptomatic a previously dormant condition, far
exceeds the evidence needed to show that Heuser took advantage of the lack of knowledge, ability,
experience, or capacity of Mr. Williams to a grossly unfair degree.



 We disagree. The record is devoid of any evidence which indicates that Heuser's course of
conduct was grossly unfair to Michal. The agreement Michal entered into with Heuser states that
he was not responsible for paying for any service that he did not receive. Furthermore, Dr. Martin,
Michal's expert, stated that he was not critical of Dr. Nix's estimation that Michal could have
reached maximum medical improvement in thirty visits. Therefore, the trial court did not err in
granting Heuser's motion for directed verdict on the Williamses' unconscionable course of conduct
claim under the DTPA.

 Knowing Violation of DTPA

 The Williamses contend that Dr. Nix committed a knowing violation of the DTPA because
he "knew what steps should have been taken when Mr. Williams reported stiffness in a new and
previously unexamined part of his spine." 

 Section 17.50(b)(1) of the DTPA allows trebling of all actual damages if the trier of fact finds
that the defendant violated the DTPA "knowingly." Tex. Bus. & Com. Code Ann. § 17.50(b)(1)
(Vernon 2003). Because we have not found any evidence of Heuser's violation of the DTPA, we
need not address whether Heuser acted knowingly. Therefore, the trial court did not err in granting
Heuser's motion for a directed verdict on all of the Williamses' DTPA claims. The Williamses' first
three issues are overruled.


Factual Sufficiency of the Evidence

 In their two final issues, the Williamses contend that the jury's findings of "no" on the
negligence and the second informed consent question are so against the great weight and
preponderance of the evidence as to be clearly wrong and unjust.

Standard of Review

 When conducting a factual sufficiency review, this court must consider all of the evidence,
including any evidence contrary to the verdict. Plas-Tex. Inc. v. U.S. Steel Corp., 772 S.W.2d 442,
445 (Tex. 1989). We must reverse on the basis of factual insufficiency if the court's finding is so
against the great weight and preponderance as to be manifestly unjust. Pool v. Ford Motor Co., 715
S.W.2d 629, 635 (Tex. 1986). Findings of fact are the exclusive province of the factfinder. 
Bellefonte Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 744 (Tex. 1986). This court is not a
factfinder and may not pass on the credibility of the witnesses or substitute its judgment for that of
the trier of fact, even if a different conclusion could be reached on the evidence. See Herbert v.
Herbert, 754 S.W.2d 141, 144 (Tex. 1988); Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex. App.-
Dallas 1986, writ ref'd n.r.e.). When a party without the burden of proof on an issue challenges the
factual sufficiency of the evidence, the question is whether the evidence in support of the
complained-of finding is insufficient. Gooch v. American Sling Co., 902 S.W.2d 181, 184 (Tex.
App.-Fort Worth 1995, no writ). An assertion that the evidence is "insufficient" to support a fact
finding means that the evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the finding should be set aside and a new trial ordered. Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965). When a party challenges the factual sufficiency of the evidence on
an issue where that party has the burden of proof, the question is whether the factfinder's failure to
make a finding is against the great weight and preponderance of the evidence. Gooch, 902 S.W.2d
at 184.

Negligence

 The elements of a negligence cause of action are 1) a legal duty, 2) a breach of that duty, and
3) damages proximately resulting from the breach. Van Horn v. Chambers, 970 S.W.2d 542, 544
(Tex. 1998). The components of proximate cause are cause-in-fact and foreseeability, and these
elements cannot be established by mere conjecture, guess, or speculation. Doe, 907 S.W.2d at 477. 
The test for cause-in-fact is whether the negligent act or omission was a substantial factor in bringing
about the injury, without which the harm would not have occurred. Id. Cause-in-fact is not shown
if the defendant's negligence did no more than furnish a condition which made the injury possible. 
Id. The element of foreseeability is whether the injury might have been contemplated as a result of
the defendant's conduct. Id. at 478. 

 On cross-examination, Dr. Martin testified that in his opinion, the conditions found by Dr.
Russell that related to Michal's neck pre-existed the time that Michal was treated by Heuser
Chiropractic. Dr. Martin stated that he thinks those conditions were aggravated by Dr. Nix's
treatment. Although Dr. Martin did not examine Michal, he concluded the symptoms of spinal cord
effacement were not present when Michal began treatment but were present when he stopped
treatment. Dr. Martin also thought that Dr. Nix did an excellent job of treating Michal's lower back. 
Dr. Martin agreed that when Michal presented to Dr. Nix on January 24, 1998, the range of motion
test performed on Michal's cervical spine showed that he was normal.

 On cross-examination, Dr. Russell agreed that Michal did not state on his initial visit form
that he had an onset of acute symptoms during the period of time he was being treated by a
chiropractor. Dr. Russell could not state with certainty that each of Michal's conditions were present
prior to January of 1998 or from November of 1997 to January of 1998. Dr. Russell did state,
however, that the stenosis caused by the osteophytes and the contact between the osteophytes and
the spinal cord had been in existence prior to the time Michal sought chiropractic care in November
1997. Dr. Russell also stated that the degenerative disc condition in Michal's neck had been in
existence prior to the time that he sought chiropractic care. 

 Dr. Russell further testified that once bone spurs start touching the spinal cord, some
symptoms will begin to show and that there is no way of predicting when the symptoms will begin. 
Dr. Russell also stated that in Michal's line of work, the irrigation business, where he bends and
stoops and moves his head, such movements could cause a condition such as Michal's to become
symptomatic. He also said that the ruptured disc in Michal's neck could have been in existence prior
to the time Michal sought chiropractic care. Dr. Russell did not know whether the disc herniation
that was observed on the MRI occurred before Michal began chiropractic treatment or after. He also
stated that he did not observe any evidence in the MRI or his physical examination to support a
conclusion that any of the conditions he observed in Michal were caused by Dr. Nix or the
chiropractic treatment. Dr. Russell further testified that in his examination of Michal, he did not find
any evidence that the chiropractic manipulations aggravated the condition that pre-existed the
chiropractic treatments or any evidence that Michal was harmed or damaged by anything Dr. Nix did
or failed to do.

 Dr. Nix testified at the beginning of Appellees' case-in-chief. He testified that he is currently
operating his own chiropractic practice, but prior to that, he was an employee of Heuser Chiropractic. 
Dr. Nix stated that he did not pressure Michal into receiving treatment at Heuser Chiropractic. Dr.
Nix also testified that at no time did he guarantee Michal that he would cure his condition, only that
he "would try to get him as corrected as much as possible with our treatment." Dr. Nix further stated
that Michal never complained that he was in pain when Dr. Nix performed any of the cervical
manipulations, either during or after. 

 In Dr. McKechnie's opinion, Michal had a very advanced case of degenerative joint disease
in his neck, a sizeable bone spur, and spinal cord decompression of long-standing duration. He also
stated that he thought these conditions existed before Michal's treatment at Heuser Chiropractic. 
When asked what would happen to a patient who had a bone spur that was pushed into the spinal
cord, Dr. McKechnie stated that he would experience "Lhermitte's sign," which is "like an electric
shock that is passed through the spinal cord that would run into both legs, probably down both arms,
and possibly up into the face." Dr. McKechnie testified that he could not find any evidence from
Michal's records that he exhibited Lhermitte's sign. Based on his interpretation of Michal's MRI,
the degeneration in his spinal cord is consistent with a long-standing, degenerative problem and not
an impact-type trauma. Because Michal did not exhibit a Lhermitte's sign or any other type of sign
to indicate trauma, Dr. McKechnie believes that the chiropractic treatments administered by Dr. Nix
did not cause or aggravate Michal's condition. 

 Dr. McKechnie also stated that he does not think that Michal received an inappropriately-applied spinal manipulation. He also testified that the spinal manipulations were appropriate under
the circumstances based upon the information that was available to him and the history and clinical
picture given to him by the patient. After reviewing Michal's medical records and notes, Dr.
McKechnie does not think that Dr. Nix's manipulations of Michal's cervical area fall below the
standard of care.

 Based on our review of the evidence, both contrary to and in support of the verdict, we hold
that the jury's finding on the negligence issue is not against the great weight and preponderance of
the evidence. The Williamses' fourth issue is overruled.

Informed Consent

 In their final issue, the Williamses argue that the jury's "no" answer to the question of "if
those risks [incident to cervical manipulation] had been so disclosed, would a person of ordinary
prudence have refused such treatment under the same or similar circumstances" is against the great
weight and preponderance of the evidence. (5)

 The theory of informed consent is based on negligence, and a plaintiff may not recover unless
he proves both that he would not have consented to treatment had he been informed of the
undisclosed risk and that he was injured by the occurrence of the risk of which he was not informed. 
Hartfiel v. Owen, 618 S.W.2d 902, 905 (Tex. App.-El Paso 1981, writ ref'd n.r.e.). 

 The Williamses do not direct us to, nor can we find, any evidence in the record to show that
Michal or any other reasonably prudent person would not have consented to treatment had he been
informed of any undisclosed risks or that Michal was injured by the occurrence of any risks of which
he was not informed. Accordingly, we conclude that the jury's answer to question three is not
against the great weight and preponderance of the evidence. The Williamses' final issue is
overruled. 


Conclusion

 The Williamses failed to produce a scintilla of evidence to support their DTPA claims;
therefore, the trial court did not err in granting Heuser's motion for directed verdict. Likewise, the
jury's findings with regard to negligence and whether a reasonably prudent person would have
consented to treatment had any risks been disclosed are not against the great weight and
preponderance of the evidence. Therefore, the trial court's judgment is affirmed.


 DIANE DEVASTO 

 Justice



Opinion delivered January 21, 2004.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.




(PUBLISH)
1. For the sake of simplicity, all appellees will be collectively referred to as "Heuser;" each appellee will be
referred to by name. 
2. In describing the cervical manipulations, Michal stated that Dr. Nix would "grab my head somehow and
twist it both ways . . . he popped it. He moved it, you know, to the right and to the left and it sounded like fireworks. 
A lot of stuff was popping." Dr. Nix stated that "I would be standing at the head of the table, patient lying on his
back combined with a mild extension, mild rotation towards the right. Rotation to the right, mild extension with a
backward to front assistance to the muscle." 
3. Dr. Kubeka and Linda Kenshalo were nonsuited at some point after the Williamses filed their original
petition. 
4. We note that because chiropractors were not mentioned in the definition of "health care provider" at the
time the Williamses' DTPA causes of action accrued, such claims are not barred by the Medical Liability Insurance
Improvement Act. See Ponce v. El Paso Healthcare Sys., Ltd., 55 S.W.3d 34, 37 (Tex. App.-El Paso 2001, pet.
denied). 
5. This question was conditioned upon the jury's affirmative answer to the question, "Did Dr. Nathan Nix
fail to obtain informed consent from Michal Williams for cervical manipulation?"