# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00442-CV

**American Family Life Assurance Company of Columbus, Appellant**

**v.**

**Texas Health Insurance Risk Pool, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY,
NO. C-1-CV-06-000829, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The American Family Life Assurance Company of Columbus ("AFLAC") appeals from the trial court's judgment finding that AFLAC was subject to an interim assessment by the Texas Health Insurance Risk Pool (the "Pool") in June 2004. The question presented is whether a transition provision in Senate Bill 467[1] removing AFLAC's exemption on its lines of insurance and making it subject "to an assessment for a net loss for a fiscal year beginning on or after January 1, 2004" subjects AFLAC to an interim assessment or only a regular assessment after the end of the year when the amount of the Pool's final net loss could be determined. We hold that the trial court properly held that AFLAC is subject to an interim assessment, and we affirm the judgment of the trial court.

---

[1] *See* Act of May 28, 2003, 78th Leg., R.S., ch. 840, §§ 1, 14(b), 2003 Tex. Gen. Laws 2627, 2627-28, 2632 (effective June 20, 2003).

**BACKGROUND**

AFLAC is a provider of supplemental health insurance. The Texas Legislature created the Texas Health Insurance Risk Pool in 1989 to provide otherwise uninsurable individuals with access to health coverage.[2] As a consequence of the passage of the Health Insurance Portability and Accountability Act in 1996, which required Texas "to enact a mechanism to establish access to health insurance coverage on an individual basis" or be preempted by federal law, the legislature funded the Pool in 1997.[3] To fund the Pool, the legislature authorized the State to assess charges against health insurance companies. Pursuant to Subchapter F, Chapter 1506 of the Texas Insurance Code, the legislature authorized the Pool to collect both interim and annual assessments from health insurers to provide access to such coverage. *See* Tex. Ins. Code Ann. §§ 1506.251, .253 (West Supp. 2006).

As to interim assessments, the Pool may assess "advance interim assessments, as reasonable and necessary for the pool's organizational and interim operating expenses." *Id.* § 1506.251(a). The Pool then credits the interim assessment as an offset against the year-end regular assessment. *Id.* § 1506.251(b). An interim assessment is defined in the rules promulgated by the Texas Department of Insurance as follows: "An assessment made for the purpose of funding anticipated shortfall of revenues to cover organizational and interim operating expenses, including claims, of the pool." 28 Tex. Admin. Code § 3.4401(a)(3) (2004) (Tex. Dep't of Ins., Assessments).

---

[2] *See* Act of May 27, 1989, 71st Leg., R.S., ch. 1094, 1989 Tex. Gen. Laws 4477.

[3] House Comm. on Ins., Bill Analysis, Tex. H.B. 710, 75th Leg., R.S. (1997).

As to regular assessments, the Pool computes the amount of the insurer's annual assessment and allows the Pool to "recover any net loss of the pool by assessing each health benefit plan issuer an amount determined annually" based upon the insurer's reports required by and filed with the Pool. Tex. Ins. Code Ann. § 1506.253 (West Supp. 2006). The Department's rules define this annual assessment as "[a]n assessment made for the purpose of recouping any net losses of the pool during the previous calendar year." 28 Tex. Admin. Code § 3.4401(a)(4).

Thus, each year, insurers file with the Pool a Texas Health Insurance Risk Pool Health Insurance Premiums Reporting Form on which the insurer reports the amount of premiums collected on various lines of insurance during the previous calendar year. On the form, the insurer reports the "net assessable health insurance premiums" collected for the prior year and the "total premium exempt from assessment." The Pool uses the information on the form to determine whether any assessments should be levied against the insurer. In accordance with section 1506.251, which allows for interim assessments, the Pool bases the interim assessment on the insurer's reporting forms for the prior year.[4] Until the end of the year, then, when final calculations are completed, interim assessments are based on estimated operating expenses and anticipated shortfall of revenues. Because the interim assessment is based on an estimate of the year-end assessment, the insurance code provides that the Pool shall credit the assessment as an offset against the annualized regular assessment. Tex. Ins. Code Ann. § 1506.251(b).

---

[4] Following the enactment of SB 467, the Pool used AFLAC's 2003 reporting form to determine its 2004 interim assessment. Although certain premiums reported for each category were not assessed for 2003, they were assessed for 2004, and the amounts were determinable from the form.

*The Controversy*

In 2003, the legislature removed the exemption for certain lines of insurance, making AFLAC subject to the Pool's assessments for the first time.[5]  SB 467 became effective immediately upon signing, on June 20, 2003.  The language at issue in the transition provision in section 14(b) of SB 467 provides:

> Section 13, Article 3.77, Insurance Code, as amended by this Act, applies only to an assessment for a net loss for a fiscal year beginning on or after January 1, 2004.[6]

Because this provision references "only" an assessment for a "net loss," AFLAC asserts that it was not liable to the Pool for an interim assessment due in June 2004, as the net loss for the 2004 fiscal year had yet to be determined and would not be determined until mid-2005.

On May 17, 2004, the Pool sent a Notice of Assessment to AFLAC stating that AFLAC owed an interim assessment of $1,647,649, which was due on June 21, 2004.[7]  AFLAC did not pay the advance interim assessment for 2004, contending that it was not subject to an interim assessment for 2004 under SB 467.  On May 19, 2005, the Pool sent a Notice of Assessment to AFLAC levying a regular assessment as calculated pursuant to section 1506.253.  This assessment was based upon the premiums reported to the Pool by AFLAC in 2005 for the 2004 calendar year.  The regular assessment of AFLAC for the 2004 calendar year was $1,724,764—approximately

---

[5]  Act of May 28, 2003, 78th Leg., R.S., ch. 840, § 1, 2003 Tex. Gen. Laws 2627, 2627-28.

[6]  *Id.* § 14(b), 2003 Tex. Gen. Laws 2627, 2632.

[7]  *See* Tex. Ins. Code Ann. § 1506.254(a) (West Supp. 2006) (providing assessment due on date specified by board that is not earlier than thirty days after the date written notice is transmitted).

4

$77,000 greater than the advance interim assessment. The parties agree that AFLAC lines are to be assessed; they disagree only as to the start date of the implementation of the assessment.

Because a "net loss" can only be determined after the books are closed for a particular fiscal year, here the year 2004, AFLAC contends it was not liable to the Pool for an interim assessment due in June 2004, as the net loss for the 2004 fiscal year had yet to be determined. AFLAC urges on appeal that the trial court erred in misconstruing the transition provision and failed to give effect to the plain language of the bill. Thus, AFLAC contends that the provision was intended to delay AFLAC's initial assessment until the regular assessment for 2004 was levied in June 2005.

The Pool responds that, as part of the statutory scheme, the transition provision simply provided a start date for AFLAC to be subject to the assessment on the same footing as other carriers for the fiscal years beginning on or after January 1, 2004. Thus, AFLAC was required to pay an interim assessment as it became due—in June 2004—after AFLAC became subject to the statutory scheme in January 2004.

*The Lawsuit*

On February 9, 2006, the Pool filed suit in Travis County Court of Law No. 1 seeking to recover interest on the advance interim assessment that AFLAC did not pay. After a hearing on the parties' cross-motions for summary judgment, the trial court granted the Pool's motion, ruling that AFLAC was liable to the Pool for an advance interim assessment for 2004. The parties agree that the amount in dispute in this appeal is the amount of statutory interest incurred between the time

5

that the interim assessment was due and the time that AFLAC paid its regular assessment—or $104,907.84. This appeal by AFLAC followed.

**ANALYSIS**

We must construe statutes as written and, if possible, ascertain legislative intent "first and foremost" from the statute's language. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006); *see also Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex. 1985). We must also consider the statute as a whole rather than its isolated provisions. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex. 1999); *Morrison*, 699 S.W.2d at 208. We should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002); *Barr v. Bernhard*, 562 S.W.2d 844, 849 (Tex. 1978). Likewise, we presume that the legislature intends a just and reasonable result and that an entire statute is to be effective. Tex. Gov't Code Ann. § 311.021(2) (West 2005).

Even when a statute is not ambiguous on its face, we may consider other factors to determine the legislature's intent, including the object sought to be obtained; the circumstances of the statute's enactment; the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; the consequences of a particular construction; administrative construction of the statute; and the title, preamble, and emergency provision. *Id.* § 311.023 (West 2005); *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 350 (Tex. 2000).

6

Citing the traditional canon of statutory construction that every word of a statute must be given effect, *see Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981), AFLAC focuses upon the words "only" and "for a net loss" in urging that it is exempt from any assessment until a regular assessment is imposed in June 2005. AFLAC contends that the trial court failed to give effect to the legislature's decision to modify the word "assessment" with the limiting phrase "for a net loss." However, when we consider the meaning of these words in their context within the statute as a whole, AFLAC's interpretation finds no support.

Entitled "Assessments for Operation of Pool," Subchapter F authorizes the Pool to make assessments of insurance carriers to ensure the continued operation of the Pool. Tex. Ins. Code Ann. §§ 1506.251-.258 (West Supp. 2006). Section 1506.251 makes clear that the authorized assessments "includ[e] making advance interim assessments" as reasonable and necessary "for the pool's organizational and interim operating expenses." *Id.* § 1506.251. The interim assessment is then credited as "an offset against any regular assessment that is due after the end of the fiscal year." *Id.* Although the Pool then determines net loss for the preceding calendar year, *see id.* § 1506.252, it is tasked with calculating the assessment according to a formula to cover the net loss. Rather than constituting a separate assessment not contemplated by the transition provision, the interim assessment is merely a funding mechanism, which is then credited against the final calculation of net loss. *Id.* § 1506.251(b). That the Pool may determine the timing of the funding mechanism is set forth in section 1506.254 entitled "Assessment Due Date; Interest" providing for interest to be assessed when an assessment becomes delinquent: "An assessment is due on the date specified by the [Pool] that is not earlier than the 30th day after the date written notice of the assessment

7

is transmitted to the health benefit plan issuer." *Id.* § 1506.254. The subchapter then authorizes the Pool to "recover or collect assessments" made and "provide the procedures, criteria, and forms necessary to implement, collect, and deposit assessments under this subchapter." *Id.* §§ 1506.257, .258.

The Pool's Notice of Assessment to AFLAC for the 2004 interim assessment advised that a "total of $88,000,000 in new funds" would be collected on an interim basis. The Notice stated: "This is the estimated assessment amount needed to maintain a positive cash balance to June 2005." The interim assessment, then, covers the projected cash requirements for the Pool for the year, and the regular assessment calculated at the end of the year operates as a "true-up" computation or reconciliation. Because the interim assessment is credited as an offset against the regular assessment, both are measured by the determination of net loss at the end of the fiscal year. *Id.* §§ 1506.251(b), .253(a).

This dispute arose when SB 467 was enacted in 2003, adding into the Pool's assessable premium base lines of insurance that were formerly exempted. The bill, which amended more than just the assessment powers of the Pool,[8] was made effective "immediately." Act of May 28, 2003, 78th Leg., R.S., ch. 840, § 16, 2003 Tex. Gen. Laws 2627, 2632. Its provisions concerning assessments by the Pool were subject to the transition provision. AFLAC thus urges that by using the term "net loss" in the provision, the legislature intended to confine its meaning to a regular assessment, that is, an assessment occurring after the fiscal year to which

---

[8] The parties do not contend that any other changes are relevant here.

it applies, and that it cannot refer to an interim assessment, which is calculated in advance of a net loss determination.

Whether the assessment is made on an interim basis that is credited as an offset against a regular assessment after the end of the fiscal year or it is the regular assessment itself, both assessments fund the Pool and are calculated and reconciled after the close of the fiscal year based upon the Pool's net loss for the fiscal year. Section 11(c) of SB 467 provides that "[a]ny net loss for the year shall be recouped by assessments on insurers." *Id.* § 11(c), 2003 Tex. Gen. Laws 2627, 2631. The only assessments provided for by Subchapter F are interim and regular assessments, both of which hinge on net-loss calculations. Thus, the language of the statute counsels against the interpretation given it by AFLAC. Because any net loss is recouped by assessment, the only assessments are interim and regular assessments, and both are based on net-loss calculations, it follows that the language of the transition provision unambiguously operates to make AFLAC subject to the Pool's assessments according to the existing statutory scheme.

By its plain language, the provision does no more than immediately implement an effective date for newly assessable lines and put AFLAC on the same footing as other carriers subject to the existing statutory scheme. At most, the provision—effective immediately on June 20, 2003—made clear that AFLAC would not be subject to an assessment for any part of the year 2003; rather, the provision specified a start date of January 1, 2004, advising that 2004 is the first year of losses for which the Pool may recoup through an assessment on AFLAC's lines of insurance.

AFLAC's argument focuses entirely on reading a single provision in isolation. *See Fitzgerald*, 996 S.W.2d at 866. Because the provision does not contain a reference to an interim

9

assessment, AFLAC contends that the legislature intended that AFLAC only be subject to the regular assessment. Although AFLAC became subject to the assessment in January 2004, they argue they should not have to contribute to the Pool's cash flow until the second year of the statute's applicability. But, when analyzing the words used by the Legislature, we are instructed to look at the entire statute and not its words in isolation. *Id.* Considering the statute as a whole, there is no indication that the legislature intended for AFLAC to be exempt from coverage under the statute for a two-year period.

Even though AFLAC urges that the provision's plain language requires its interpretation, AFLAC further contends that it and others who were newly subjected to the assessments were entitled to budget and plan for the new cost to be imposed on the companies by the assessment. Because section 14(b) is an uncodified transition provision having effect for only a temporary period of time, and not a codified provision of the insurance code, AFLAC contends that the Pool overlooks the purpose of such a provision and that its intended effect is to allow for a change during the transition period of essentially two years. Hence, AFLAC argues that such a construction does not limit or prohibit interim assessments against AFLAC in future years in accordance with the existing statutory scheme. Once the transition period was complete and the legislative changes brought about by SB 467 were fully implemented, the uncodified transition provision of SB 467 would no longer have any bearing on the Pool's ability to assess its members from that point forward.

A "transition provision" includes any temporary provision providing for a special situation during the transition period between the time of the existing law and the establishment

or implementation of a new law. Tex. Gov't Code Ann. § 311.031 historical & statutory notes (West 2005) [Act of Feb. 21, 1989, 71st Leg., R.S., ch. 1, § 1, 1989 Tex. Gen. Laws 1, 1]. While it is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose and we must give effect to every word and phrase if it is reasonable to do so, we nevertheless construe words in their context and in harmony with the whole of the statute. That a transition provision allows for the orderly implementation of legislation does not operate to give its words weight out of keeping with the entirety of the statute. To the contrary, the provision "does not affect the prior operation of the statute" or any "obligation or liability" incurred under it. *Id.* § 311.031(a).

Apart from the tenet that we give meaning to every word, AFLAC cites no authority, and we have found none in which greater weight is given to a transition provision than the text of the statute as a whole. Rather, we must be faithful to the statutory scheme, take the whole statute as we find it, and "give it as great an internal symmetry and consistency as its words permit." *United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 236 (1955). If doubt or uncertainty exists as to the meaning or application of a statute's provisions, we look to the act in its entirety and harmonize its provisions in accordance with legislative intent and purpose:

> It is always an unsafe way of construing a statute or contract to divide it by a process of etymological dissection, and to separate words and then apply to each, thus separated from its context, some particular definition given by lexicographers and then to reconstruct the instrument upon the basis of these definitions.

2A Norman J. Singer, *Sutherland Statutory Construction* § 46.05 (6th ed. 2000) (footnote omitted).

11

If it were the intention of the legislature to distinguish between the two types of Subchapter F assessments, it knew how to do so.[9] To ascribe greater meaning to the provision at issue than a start date consonant with the existing statute accomplishes a broader change than the language may carry and imputes an intent other than to ensure the continuity of the Pool's funding during this period of transition. In the absence of additional words or phrases well known to the legislature, we may not undo the mechanism of funding crafted by the legislature and implemented by the Pool in the existing statute. If the provision was intended to do more, we can only suppose it would say more. Had the legislature intended a process by which newly assessable lines were exempt from a levy for two years after the statute's effective date, such purpose could have been easily expressed.

## CONCLUSION

We overrule AFLAC's issues and affirm the trial court's grant of summary judgment in favor of the Pool.

---

[9] Indeed, when the legislature reinstated the exemption in 2005 for the lines of insurance added to the assessment base by SB 467, it included a transition statement making the change applicable to "an assessment under Subchapter F," thus making clear that the provision included both interim and regular assessments. Tex. Ins. Code Ann. § 1506.253 historical & statutory notes (West Supp. 2006) [Act of May 29, 2005, 79th Leg., R.S., ch. 824, § 11(e), 2005 Tex. Gen. Laws 2824, 2829]. The Act's effective date was January 1, 2006. AFLAC contends that this change shows that the legislature knew how to include both assessments, failed to do so in SB 467, and that this therefore supports its interpretation. Because AFLAC began its challenge to the interim assessment in June 2004 and SB 809 was filed in February 2005, this language is consistent as well with a legislative intent to clarify any change and to avoid the type of dispute raised by this litigation.

12

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   April 3, 2007